**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 1, 2013**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff - Appellee, | No. 11-1536 |
| v. | (D. Colorado) |
| CEDRIC LIPSEY, | (D.C. No. 1:09-CR-00387-PAB-1) |
| Defendant - Appellant. | |

**ORDER AND JUDGMENT**[*]

Before **HARTZ**, **ANDERSON**, and **GORSUCH**, Circuit Judges.

Defendant and appellant, Cedric Lipsey, appeals his sentence following his plea of guilty to three counts of wire fraud, in violation of 18 U.S.C. §§ 1343 and 2.[1] Arguing that his sixty-three month sentence is procedurally and substantively unreasonable, he seeks a new sentencing hearing. For the following reasons, we affirm his sentence.

---

[*]This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

[1]Mr. Lipsey also pled guilty to one count of forfeiture, pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c), of property constituting or derived from the proceeds of wire fraud. The government subsequently abandoned this forfeiture claim.

## BACKGROUND

The parties stipulated in Mr. Lipsey's plea agreement that the government's evidence would demonstrate the details of the wire fraud scheme to which Mr. Lipsey pled guilty. We summarize the pertinent facts from that agreement.

Between April 2004 and February 2006, primarily in the general area of Denver, Colorado, Mr. Lipsey, a licensed real estate broker, along with Philip A. Martinez, a loan officer and mortgage broker, implemented a scheme to defraud lending institutions that funded residential mortgages. Mr. Lipsey held himself out as a successful real estate agent and investor. He would induce "buyers" or "investors" (hereafter "first investors" or "first buyers"), individuals with good credit whom he met through his church, through friends and relatives and through self-help seminars, to participate in a program where he claimed they could legitimately acquire properties and profit by reselling them without investing any money of their own.

Accordingly, Mr. Lipsey and Mr. Martinez would arrange for these "first investors" to submit loan applications to obtain mortgages on residences. He and Mr. Martinez would include false representations in the loan applications where necessary to influence lenders to approve loans. Shortly after these first investors/buyers had purchased their properties, Mr. Lipsey would arrange for them to sell the properties to other comparable "investors" (hereafter "second investors" or "second buyers") at substantially higher prices. Mr. Lipsey and

Mr. Martinez received money in the form of commissions, fees and proceeds from the sales transactions.

While that is the essence of the fraudulent scheme, there are a few other details which explain why the scheme lasted as long as it did. Mr. Lipsey would tell the first buyers that they were buying the residences at less than their market value, and that the resale price was at or above their market value, thereby enabling a quick profit. In fact, the first investors purchased the properties at or near their market value, contrary to Mr. Lipsey's representations. These first investors further stated that Mr. Lipsey told them he would take care of all paperwork and pay for any associated costs. The buyers' only role would be to hold the properties in their names for a short period of time. For their participation, Mr. Lipsey paid them amounts of money ranging from $3,000 to $15,000 after the property was sold.

When Mr. Lipsey arranged to sell the recently purchased properties to the second buyers/investors, he made these buyers the same assurances as the first buyers (he would handle all paperwork and expenses). Because of their limited involvement as investors/buyers who did not intend to live in the homes, these second buyers did not critically evaluate the price of the homes, which Mr. Lipsey inflated to more than market value. To satisfy lenders for the sales to these second buyers, Mr. Lipsey and Mr. Martinez arranged to have inflated appraisals prepared.

In exchange for the second buyers' participation, Mr. Lipsey represented to them that he would pay them money (ranging from $5,000 to $10,000) just after their purchases and then manage the properties as rentals and make mortgage payments until he resold them. Or, he offered to pay them a larger sum ($90,000 to $140,000) with which the buyers could themselves manage the properties as rentals and make mortgage payments until Mr. Lipsey sold the properties.

With respect to the lending institutions, Mr. Martinez played a large role in insuring that the loans were made, typically with nearly 100% financing, which required no, or only minimal, down payments. Mr. Martinez also found loans which required little proof of the borrowers' employment, assets or income. Accordingly, as indicated above, Mr. Martinez provided false information about the buyers' qualifications. Both Mr. Lipsey and Mr. Martinez employed a number of other tactics to lull the lending institutions to issue the loans they sought.

The scheme eventually was discovered. As the plea agreement states, "As a result of this fraudulent scheme, the individuals who ended up as the second (and in one instance the third) buyers learned that the properties they had purchased were worth substantially less than amounts for which they had been mortgaged. All but one of the properties have gone into foreclosure. The actual loss to the lenders is $4,430,240.29,[2] because the unpaid principal balances on their loans

---

[2] While this was the loss amount stated in the plea agreement, it ultimately was adjusted.

exceeded the amounts they recovered by reselling the properties." Plea Agreement at 21, R. Vol. 1 at 74.

The only disputed issues in this case are the amount of loss attributed to Mr. Lipsey's fraud, the amount of restitution which he is required to make, and the impact of those two calculations on Mr. Lipsey's prison sentence. After multiple sentencing hearings addressing the issues of loss calculation and restitution, the district court determined that the government had proven, by a preponderance of the evidence, that the total loss from Mr. Lipsey's fraudulent scheme, for purposes of sentencing under the advisory United States Sentencing Commission, Guidelines Manual ("USSG"), was $4,208,860.11. The court further concluded that, pursuant to the Mandatory Victims Restitution Act ("MVRA"), 18 U.S.C. § 3663A(b)(1)(A), Mr. Lipsey was required to make restitution in the amount of $2,922,759.89. Mr. Lipsey disputes these amounts and, in particular, the methodology used to calculate them.

In preparation for sentencing under the advisory Guidelines, the United States Probation Office prepared a presentence report ("PSR"). The PSR arrived at a total offense level of 26, which included an 18-level upward adjustment because, pursuant to USSG §2B1.1(b)(1)(J), the loss exceeded $2,500,000 but was less than $7,000,000. With a criminal history category of 1, the advisory Guidelines sentencing range was 63 to 78 months. Mr. Lipsey filed objections to the PSR, challenging the loss and restitution calculations. The government filed

objections and corrections to the restitution amount. The court ultimately sentenced Mr. Lipsey to 63 months' imprisonment, after finding that the loss and restitution amounts were as stated above.

Mr. Lipsey appeals his sentence, arguing: (1) the district court erred in calculating the loss amount, thereby rendering his sentence procedurally unreasonable; (2) the district court erred in calculating the amount of restitution required, thereby also rendering his sentence procedurally unreasonable; and (3) his sentence is substantively unreasonable.

### DISCUSSION

We review sentences for reasonableness under a deferential abuse-of-discretion standard. See United States v. Alapizco-Valenzuela, 546 F.3d 1208, 1214 (10th Cir. 2008). "'Reasonableness review is a two-step process comprising a procedural and a substantive component.'" Id. (quoting United States v. Verdin-Garcia, 516 F.3d 884, 895 (10th Cir. 2008)). See Gall v. United States, 552 U.S. 38, 51 (2007). "Procedural review asks whether the sentencing court committed any error in calculating or explaining the sentence." Alapizco-Valenzuela, 546 F.3d at 1214. Substantive review, on the other hand, "involves whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)." United States v. Conlan, 500 F.3d 1167, 1169 (10th Cir. 2007). A within-Guidelines sentence is entitled to a presumption

of substantive reasonableness on appeal, and a defendant must rebut this presumption by demonstrating that the sentence is unreasonable in light of the other sentencing factors laid out in § 3553(a). Rita v. United States, 551 U.S. 338, 347 (2007); United States v. Kristl, 437 F.3d 1050, 1054 (10th Cir. 2006).

### I. Loss Calculation

Under the Guidelines, the base offense level applicable to a crime involving fraud is increased according to the amount of loss. USSG §2B1.1(b). "The court should use the greater of actual or intended loss." United States v. James, 592 F.3d 1109, 1114 (10th Cir. 2010) (citing USSG §2B1.1 cmt. n.3(A)). The Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1 cmt. n.3(A)(i).

"A district court's loss calculation at sentencing is a factual question we review for clear error." United States v. Griffith, 584 F.3d 1004, 1011 (10th Cir. 2009) (quoting United States v. Ary, 518 F.3d 775, 787 (10th Cir. 2008)). "Reversing for clear error 'requires that, based on the entire evidence, we have a definite and firm conviction that a mistake has been committed.'" Id. (quoting United States v. Hahn, 551 F.3d 977, 979 (10th Cir. 2008) (further quotation omitted)). The issue of the methodology used by the court to calculate loss, however, is a legal question which we review de novo. See James, 592 F.3d at 1114. Furthermore, "the government bears the burden of proving loss by a preponderance of the evidence." Id. Finally, "the comments to the Guideline

-7-

instruct that we are to give 'appropriate deference' to the district court's determination, because the 'sentencing judge is in a unique position to assess the evidence and estimate the loss based upon that evidence.'" Griffith, 584 F.3d at 1011 (quoting USSG §2B1.1, cmt. n.3(C)).

The district court made the following findings with respect to the loss calculation:

> At the time of the crimes to which the defendant has pled guilty, he was a licensed real estate broker. As a result of his familiarity with real estate transactions, the Court finds that, between April 2004 and March 2006, it was reasonably foreseeable to the defendant that mortgage loans on the properties involved in his fraudulent activities would be sold or repackaged to lenders other than the ones who made the [second] sale loans. . . . [I]t was also reasonably foreseeable to the defendant between April 2004 and March 2006 that the market value of the properties could fluctuate either up or down in the future.

Sentencing Mem. at 2-3, R. Vol. 1 at 269-70 (record citations omitted). The court then agreed with the government's theory of loss, "that the unpaid principal on the mortgage loan used to secure the [second] sale is reduced by the amount for which the collateral securing the loan was sold. Thus, for those properties that were subject to foreclosure, this means that the unpaid principal on the [second] sale note is reduced by [the] amount for which the property securing the note was sold after the lender reacquired the property at foreclosure." Id. at 3.

In reaching this conclusion, the court relied upon our decision in United States v. Washington, 634 F.3d 1180 (10th Cir.), cert. denied, 132 S. Ct. 300

(2011), in which we stated, "[w]here a lender has foreclosed and sold the collateral, the net loss should be determined by subtracting the sales price from the outstanding balance on the loan." Id. at 1184. Using that formula provided in Washington, the district court found that the government had proven, by a preponderance of the evidence, that the total amount of actual loss was $4,208,860.11.

We perceive no error in the court's methodology or calculations. Mr. Lipsey makes two primary arguments to us on appeal: (1) that the district court erred in ignoring the conclusion of his expert, Dr. Mark Levine, that the relevant "value" of the properties subject to foreclosure, for the purposes of calculating loss, was their appraised value at the time of foreclosure, rather than the amount for which such properties were actually sold following foreclosure; and (2) the court erroneously shifted the burden to establish loss on to Mr. Lipsey.[3]

The problem with Mr. Lipsey's first argument is it finds no support in our case law. Rather, the district court correctly followed the reasoning of Washington and explained why Mr. Lipsey's reliance on James was misplaced. Additionally, as the government and the district court point out, his argument

---

[3]With respect to his first argument, Mr. Lipsey alleges that when the "[victim/] note holder re-acquired the property following the foreclosure sale[,] . . . the value of the property at that point in time was the best and most reasonable calculation of the true value of the re-acquired property." Appellant's Op. Br. at 15.

ignores the fact that Mr. Lipsey and Mr. Martinez admitted to generating false appraisals in connection with the sales of the properties at issue.

Mr. Lipsey's second argument, to which he devotes merely a page of his brief, is equally unavailing. While it is true that the government bears the burden of establishing loss, the district court did not shift that burden to Mr. Lipsey by rejecting his argument about the value of appraisals and by not requiring the government to introduce such appraisals. As indicated above, appraisals of the kind sought by Mr. Lipsey were simply irrelevant to the calculation of loss in this case. The government properly carried its burden of proof.

## II. Restitution

Mr. Lipsey also argues that his sentence is procedurally unreasonable because the district court erred in calculating the amount of restitution he is obligated to pay under the MVRA. "We review the legality of a restitution order de novo, the district court's factual findings for clear error, and the amount of restitution for abuse of discretion." United States v. Parker, 553 F.3d 1309, 1323 (10th Cir. 2009). "The determination of an appropriate restitution amount is by nature an inexact science." Id. (further quotation omitted). Thus, the MVRA directs courts to "reach an expeditious, reasonable, determination of appropriate restitution by resolving uncertainties with a view toward achieving fairness to the victim." Id.

The district court found that the "government has proven by a preponderance of the evidence [that] restitution in the amounts and to the victims listed in the Probation Department's revised restitution list . . . is $2,922,759.89." Sentencing Mem. at 11-12, R. Vol. 1 at 278-79. As it did with the calculation of loss, the court agreed with the government's theory of restitution calculation that it "should . . . use the difference between the unpaid principal balance [on the notes from the lenders to the second buyers] and the amount that the lender received from selling the property after foreclosure." Id. at 9. The court rejected Mr. Lipsey's argument (which he continues to make on appeal) that the restitution amount should be calculated based on the amount that the lender successfully bid on the properties at the foreclosure sale. In short, the district court's methodology for calculating restitution was correct, leading to a reasonable and fair result.[4]

### III. Substantive Reasonableness

Finally, Mr. Lipsey challenges his sentence, arguing it is substantively unreasonable primarily because, at sixty-three months, his sentence is disproportionately longer than the fifty-month sentence of his equally culpable co-defendant, Mr. Martinez. As the government points out, however, Mr. Lipsey discounts or ignores the fact that Mr. Martinez entered into a plea agreement with

---

[4]We note that the total amount of restitution ordered by the district court was less than the total amount of loss calculated. This was because the identities of some of the actual owners of the defaulted notes were not specifically documented.

the government more than a year earlier than did Mr. Lipsey and he (Mr. Martinez) provided substantial information to the government. The government accordingly recommended that Mr. Martinez receive a downward departure in his sentence, based upon his substantial assistance, under USSG §5K1.1. As the district court specifically noted, "[t]he two [men] do not stand in similar positions given the aspect of cooperation." Tr. of Sentencing (Vol. 5), 11/23/2011, R. Vol.2 at 683.

Furthermore, we have stated that "[w]hile similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record." United States v. Davis, 437 F.3d 989, 997 (10th Cir. 2006) (further quotations and citations omitted). The record in this case clearly reveals the reason for the disparity between the sentences of Mr. Lipsey and Mr. Martinez. Mr. Lipsey has failed to rebut the presumptively reasonable sentence he received.

**CONCLUSION**

For the foregoing reasons, we AFFIRM the sentence imposed on Mr. Lipsey.

ENTERED FOR THE COURT


Stephen H. Anderson
Circuit Judge

-12-