**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**February 27, 2014**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

UNITED STATES OF AMERICA,

        Plaintiff - Appellee,

v.

TORRENCE JAMES,

        Defendant - Appellant.

No. 11-1270
(D.C. No. 1:06-CR-00244-WYD-7)
(D. Colo.)

**ORDER AND JUDGMENT**[*]

Before **TYMKOVICH**, **O'BRIEN**, and **MATHESON**, Circuit Judges.

This case comes to us with a tortured past and an ironic twist. In this, latest, installment Torrence James appeals from a 108-month prison sentence imposed on remand from an earlier appeal. It is the very sentence he originally expected, based on his plea agreement, and the one he requested after pleading guilty to two felonies. Both

---

[*] This order and judgment is an unpublished decision, not binding precedent. 10th Cir. R. 32.1(A). Citation to unpublished decisions is not prohibited. Fed. R. App. 32.1. It is appropriate as it relates to law of the case, issue preclusion and claim preclusion. Unpublished decisions may also be cited for their persuasive value. 10th Cir. R. 32.1(A). Citation to an order and judgment must be accompanied by an appropriate parenthetical notation – (unpublished). *Id.*

guilty pleas arose from a scheme to fraudulently obtain mortgage loans in order to purchase twenty residential homes in and around Denver, Colorado. His appeal from the original sentence of 151 months incarceration claimed the sentencing judge erroneously: (1) found him to be a leader or organizer of the criminal enterprise under United States Sentencing Guidelines Manual ("USSG" or "Guidelines") §3B1.1(a); and (2) calculated the loss sustained by the victim lenders under USSG §2B1.1. In *United States v. James*, 592 F.3d 1109, 1113 (10th Cir. 2010) (*James I*), a panel of this Court affirmed with respect to his role in the offense, but remanded for recalculation of "the actual losses of the ten original lenders [the district judge] identified as victims of Mr. James's conduct." *Id*. at 1116.

On remand a different district judge considered new evidence and re-sentenced James, who now appeals from the lesser sentence. Primarily, he claims procedural error in applying a two-level enhancement based on 10 or more victims, USSG §2B1.1(b)(2). But what this appeal really involves is the scope of a clearly limited sentencing remand. There was no procedural error because the sentencing judge properly followed our remand instructions. James also claims the government presented insufficient evidence to establish the total loss sustained by the victims of his crimes exceeded $1 million. The evidence was sufficient. We affirm.

## BACKGROUND

A. Original Proceedings in District Court

The following factual summary is taken from James's opening brief in his appeal from the sentence originally imposed:

- 2 -

On November 2, 2006, a 48-count second superseding indictment was filed in this case, naming Torrence James and six others as defendants. Mr. James was charged with 20 counts of wire fraud, in violation of 18 U.S.C. § 1343; three counts of aggravated identity theft, in violation of 18 U.S.C. § 1028A; three counts of money laundering, in violation of 18 U.S. C. § 1956; three counts of engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. §1957; and one count of conspiracy to commit wire fraud and aggravated identity theft, in violation of 18 U.S.C. § 371. He was also named in a forfeiture count pursuant to 18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461.

The wire-fraud counts charged that the defendants participated in a scheme to obtain real estate financing by submitting materially false statements to lenders in connection with purchases of real estate by nominee or "straw" buyers, with Ronald Fontenot, Mr. James, and others acting as their mortgage brokers. Through the use of inflated appraisals, loans were obtained in amounts that exceeded the actual sale prices of the properties, with the sellers agreeing to have the excess funds disbursed on behalf of the buyers at closing, purportedly to fund improvements on the property. These excessive funds, however, were disbursed to one or more of the defendants for their personal benefit.

Mr. James ultimately entered into a written plea agreement with the government. He agreed to plead guilty to one count of wire fraud (Count 5) and to one count of engaging in a monetary transaction in property derived from specified unlawful activity (Count 40). He also agreed to pay restitution as determined by the court at sentencing. In return, the government agreed to dismiss the remaining counts, to support a downward adjustment for acceptance of responsibility, and to recommend a sentence within the advisory guideline range.[1] The district court conducted a change-of-plea hearing on January 10, 2007, and received the pleas, finding they were knowingly and voluntarily made. It deferred its decision as to whether to accept the plea agreement until the probation department completed a presentence report ("PSR").

Although sentencing was initially set for April 6, 2007, the court did not impose sentence until March 26, 2008. Four sentencing hearings were held; eight addendums to the PSR were prepared. The issues disputed included the scope of relevant conduct for which Mr. James should be held responsible, the calculation of loss resulting from that conduct, Mr. James's role in the offense, and his acceptance of responsibility. Ultimately, the district court accepted the plea agreement, and sentenced Mr. James to 151 months (12.6 years) on count 5 and 120 months on count 40, to run

concurrently; 3 years of supervised release; joint and severable restitution of $ 26,636 payable to two identified victims; and $200 in special assessments. In addition to its oral findings and conclusions, the district court filed a written statement of reasons for its sentencing determination.

> FN1. The government subsequently withdrew it[s] recommendation for a reduction based upon acceptance of responsibility. The court, however, made the 3-level downward adjustment.

(Appellant's Opening Br., # 08-1115 at 2-4 (record citations omitted)).

The severity of a recommended guidelines sentence is determined (among other things) by specific offense characteristics found in USSG § 2B1.1. In this case the relevant characteristics are: (1) the total amount of economic loss resulting from the illegal conduct (the greater the loss, the more points added for offense characteristics), USSG § 2B1.1(b)(1), and (2) the number of victims (more than ten but less than 50 adds two points), USSG § 2B1.1(b)(2)(A).

The total loss is defined as the greater of the actual loss or the intended loss. USSG § 2B1.1 cmt. 3(A). If the total loss cannot reasonably be determined, the gain from the crime(s) may be substituted for loss. *Id*. cmt. 3(B). At his first sentencing—and as contemplated in the plea agreement and reflected in the Pre-Sentence Report (PSR)—the government and James agreed that loss could not reasonably be determined so the alternative method, gain, was the proper measure to establish the USSG § 2B1.1(b)(1) offense characteristics. The original PSR did not even try to estimate loss; it used gain, which it calculated to be $2,298,193. It was calculated by subtracting the actual price

- 4 -

paid for the properties from the amount financed and disbursed to James and his cronies. The government agreed with that amount. So did James.[1]

The district judge was of a different mind; he required the probation department to estimate loss. That turned out to be a daunting task. As the loss figures became available, the PSR was amended eight times over the course of a year to report for each of the twenty loans: (1) the name of the original lender; (2) the total amount of the original loan; and (3) the foreclosure sales price. *James I*, 592 F.3d at 1111. The addenda to the PSR calculated the actual loss by subtracting, for each property, the foreclosure sale price from the original loan amount. *Id*. After adding all twenty figures, the final addendum to the PSR arrived at an actual loss amount of $3,731,839. *Id*. at 1111-12. That amount added 18 points to the offense level, USSG § 2B1.1(b)(1) (loss between $2.5 and $7 million adds 18 points) rather than 16, as was done using gain figures in original PSR (loss—or gain substituted for loss—between $1 and $2.5 million adds 16 points). That change in offense characteristics moved the needle on the recommend guidelines sentence from 108–135 months to 135–168 months. *See id*. at 1113.

---

[1] "It is fair to assume . . . that by the time of final sentencing, the government's gain calculation was accepted by the defense." (Appellant's Reply Br., # 08-1115 at 4 n.4). "On appeal, Mr. James contends that actual loss in this case cannot reasonably be determined, and that the district court should have considered his gain instead. Using the $2,298,193 of gain reported in the plea agreement and the original PSR would have increased his offense level by only 16 [instead of 18]." *James I*, 592 F.3d at 1115 (footnote omitted).

But there was a complicating matter.  Many of the 20 loans, along with the pledged security for them—the property mortgages—had been sold to other financial entities and those entities, not the original lenders, had foreclosed on the mortgages.  In his objections to the PSR, James argued:

> [I]t was fairer to use gain, as had been previously agreed.  The probation department's methodology was flawed because:  (1) it did not reflect payments made on the loans by the initial purchasers, such as Mr. James; (2) although the original lenders sold most of the loans to other lenders, the amounts they received upon such a sale were not taken into account although the amounts clearly reduced their losses; and (3) the bulk of the original lenders failed to provide information as to what, if any their losses were.

(Appellant's Opening Br., # 08-1115 at 8-9.)

With respect to the complication, the judge pointed out two things:  First, the guidelines do not require absolute precision in calculating loss, merely a reasonable estimate; second, for the vagaries of loss calculations to make a difference in the offense levels it would have to amount to over $1.2 million ($3,731,839 - $2,500,000 = $1,231,839) and the difference was unlikely to even approach that amount.  Being satisfied that the PSR reasonably calculated the total losses, the judge turned to a related, but different task—figuring the restitution due to each victim, as required by USSG § 5E1.1.  For the most part, he determined the difficulty in doing so would unduly burden the sentencing process, already long delayed, and that burden outweighed the need to provide restitution to the victims.  However, two restitution claims were adequately documented; together they amounted to $26,630, which was assessed against James.  As a result, and in

spite of his participation a scam costing mortgagors over a million dollars, James

was ordered to pay only a pittance in restitution.

B.      Resolution of First Appeal

James appealed from the sentence originally imposed.  Relevant here, only the

total amount of loss was at issue, as the summary of his argument clearly shows:

> The district court committed significant procedural error when
> calculating Mr. James' advisory guideline range.  First, it did so by refusing
> to use gain for purposes of determining the specific offense characteristic
> increase to the base offense level for fraud and deceit under USSG
> § 2B1.1(b), despite the parties' agreement, the probation department's
> recommendation, and the readily determinable amount of gain.[2]

(Appellant's Opening Br., # 08-1115 at 4.)

True to his argument summary, James made two points with respect to the amount

of loss:  (1) the judge should have used gain [$2,298,193] because the loss figures were

not reasonably accurate, and (2) the judge's analysis of actual loss for sentencing

purposes was inconsistent with his analysis of loss for specific victim restitution

purposes, and victim restitution is, like the guidelines loss computation, based on actual

loss.  Significantly, neither James's opening brief nor his reply brief in the original appeal

---

[2] James raised another issue in his first appeal:  the court erred "by enhancing Mr. James' offense level by four for his role in the offense under USSG § 3B1.1 [organizer or leader enhancement] based upon findings that were not supported by the record." (Appellant's Opening Br., # 08-1115 at 4.)  We affirmed the four-level enhancement; it is not involved in this appeal.

made any mention of the two-level increase imposed for more than ten victims as dictated by USSG § 2B1.1(b)(2)(A).  Quite clearly, it was never an issue in the appeal.[3]

In *James I*, the panel identified another related matter that was not an issue in the first appeal.  The sentencing judge found the losses incurred by downstream (successor) lenders not to "constitute reasonably foreseeable pecuniary harm. . . ."  *James I*, 592 F.3d at 1115.  In footnote 3, we expressed no opinion as to the propriety of that finding, because it was not challenged on appeal, *id*., but we decided it precluded the district judge from considering downstream losses in computing total loss for purposes of U.S.S.G.§  2B1.1(b)(1).  *Id*. at 1116.[4]

The panel reversed the district judge's use of loss figures on exquisitely narrow grounds:

> It is enough to say that this particular record included no evidence to support an inference that the foreclosure sales prices were appropriate estimates of what the original lenders received when they sold the loans to the successor lenders.  Thus, those figures could not be used to determine the original lenders' actual losses.

*Id.*  The remand was equally narrow and focused:

> We therefore remand with instructions for the district court to recalculate the actual losses of the ten original lenders it identified as victims of Mr.

---

[3] "The parties' sole disagreement is whether the $3,731,839 figure reasonably represents the actual loss resulting from Mr. James's conduct or whether gain should be used as an alternative measure of loss." *James I*, 592 F.3d at 1114 n.2.

[4] Despite the district judge's finding and what the *James 1* panel may have said in passing, the use of downstream foreclosure data may be used in estimating loss.  *See United States v. Crowe*, 735 F.3d 1229 (10th Cir. 2013); *see also James I*, 592 F3d at 1117 (Lucero. J, concurring in the result).

James's conduct. . . . Because the court previously found, however, that the successor lenders' losses were not a reasonably foreseeable pecuniary harm—a finding that the government does not challenge in this appeal—the court shall not include their losses, if any, *for purposes of the § 2B1.1(b)(1) enhancement.* If the district court finds that the original lenders have suffered an actual loss, but that the loss cannot reasonably be determined, it shall explain this finding . . . . and shall use gain as an alternative measure of loss. In that case, we express no opinion on the appropriate calculation of gain.

*Id*. (emphasis supplied and citations omitted).

C.      Sentencing on Remand

On remand the new judge sentenced James to 108 months (the low end of the advisory guidelines) on each of Counts 5 and 40, to run concurrently—precisely the guideline sentence range James anticipated when he entered his guilty plea and the one he urged at the original sentencing. To that was added three years of supervised release; joint and several restitution of $26,636 payable to two identified victims; and $200 in special assessments.

To establish actual loss as the *James I* panel directed, the government went back to the drawing board with the assistance of IRS Special Agent Tim Chase. Chase testified to having attempted to contact the original lenders through e-mail, telephone calls, and correspondence. Due to the nature of James's scheme, many of the properties involved two loans. As a result of his investigation, Chase created a chart showing: (1) each of the 20 properties; (2) the buyer; (3) the original lender; (4) the original loan numbers; and (5) the actual loss, if any, sustained by the original lender.[5] Chase identified the actual

_____

[5] Any loss to the downstream purchasers was excluded from the calculation.

loss as undetermined if he could not find sufficient information to show whether there was a loss, and listed $0 if his investigation revealed there was no loss. Of the ten lenders identified in the first appeal, the chart showed one suffered no loss, and the loss to two lenders could not be determined. Of the remaining seven lenders, the actual loss shown in the loss column was followed by an exhibit number which included an affidavit from a representative of the original lender stating the lender's actual loss amount and back-up documentation. By the time of the sentencing hearing on remand, the government maintained seven of the original lenders accrued an actual loss of $1,400,567.28. (R. Vol. I at 632.)

James objected to the government's calculations on all but one property.[6] He argued it had failed to prove the original lenders were the same entities that owned the loans at the time of foreclosure, or that the lender may have made a gain during the course of transactions prior to foreclosure. The district judge agreed with James as to two of the lenders and determined an actual loss of $1,192,567.28 to the remaining five lenders resulting from the offense. He imposed a 16-level enhancement under USSG § 2B1.1(b)(1)(I) (loss between $1 and $2.5 million) and a two-level enhancement under § 2B1.1(b)(2) for an offense involving ten or more victims. Even though the Government

_____

[6] Long Beach Mortgage was purchased by Washington Mutual, which subsequently failed. FDIC was appointed receiver. Dennis Rogers of the FDIC provided an affidavit which stated Long Beach had never sold the property to any other entity prior to the purchase of the company and the loss was $95,664.01. James does not contest this loss on appeal.

had proven losses for only five lenders, the judge concluded the limited scope of this Court's remand prevented him from reconsidering the ten-victim enhancement established at James's original sentencing.

**DISCUSSION**

"In reviewing a sentence on appeal, we first determine whether the sentence is procedurally reasonable, reviewing the district court's legal conclusions de novo and its factual findings for clear error." *United States v. West*, 646 F.3d 745, 747 (10th Cir. 2011).

A.      Two-Level Enhancement Based on Number of Victims

In James's estimation, a two-level enhancement for ten or more victims was improper because at resentencing the government was only able to prove losses incurred by fewer than the ten lenders identified in the first appeal. The government concedes this would be error if this were James's original sentencing, but contends the district court correctly refused to consider the number of victims because doing so would be outside the scope of our remand. We review this "purely legal issue" de novo. *Id*.

The government relies on the Fifth Circuit's holding in *United States v. Griffith*, 522 F.3d 607 (5th Cir. 2008). There, citing the Fifth Circuit's waiver approach announced in *United States v. Lee*, the court said: "All other issues not arising out of this court's [remand] ruling and not raised in the appeals court, *which could have been brought in the original appeal,* are not proper for reconsideration by the district court below." 358 F.3d 315, 323 (5th Cir. 2004). "It follows that an objection to a sentence must be appealed for the district court, on remand, to have authority to revisit it."

- 11 -

*Griffith*, 522 F.3d at 610 (citations omitted). According to the government, because James did not challenge the two-level enhancement at the original sentencing or in his first appeal, the issue could not be considered on remand.

Our standard is less restrictive than the Fifth Circuit's. Our precedent allows the district court the discretion to expand the scope of resentencing "absent an express limitation." *West*, 646 F.3d at 749.

> [T]he scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard. Therefore we do not make inquiry into whether the issue presented is antecedent to or arises out of the correction on appeal. Instead the district court is to look to the mandate for any limitations on the scope of the remand and, in the absence of such limitations, exercise discretion in determining the appropriate scope.

*Id*. In other words, we have not adopted a strict waiver rule.

But our more elastic approach does not necessarily open the door to plenary resentencing. Here, the district judge was correct to heed the panel's articulated reason for the remand. "Under the law of the case doctrine, findings made at one point during litigation become law of the case for subsequent stages of that same litigation." *United States v. Webb*, 98 F. 3d 585, 587 (10th Cir. 1996). Under the mandate rule, the district court should conform to the appellate court's mandate, *see id*., which, in this case, directed the district court only to make findings under a particular sentencing guideline and resentence James accordingly. "[B]ut the mandate rule is a discretion-guiding rule subject to exception in the interests of justice" that may expand the "mandate under exceptional circumstances, including (1) a dramatic change in controlling legal authority; (2) significant new evidence that was not earlier obtainable through due diligence but has

- 12 -

since come to light; or (3) if blatant error from the prior sentencing decision would result in serious injustice if uncorrected." *Id.* (internal citations, quotations and alterations omitted).

If James were to be relieved of the consequences attending the law of the case, forfeiture doctrines, and our remand instructions, the government should be as well. The government's forfeited right to challenge the original sentencing judges' finding—that the losses incurred by downstream (successor) lenders do not "constitute reasonably foreseeable pecuniary harm"—would be open to reconsideration,[7] as would the victim restitution order.[8] The use of intended loss as opposed to actual loss might also be on the table.[9]

A freewheeling resentencing would involve all of those considerations, most of which James would not welcome. Rather than a truly plenary resentencing, he invites a quite limited, "heads I win, tails you lose," approach. Understandable, but not what the remand order contemplated. Our specific direction was to recalculate the actual losses

---

[7] "We do not suggest that a district court may never consider successor lenders' actual loss in calculating the total loss under U.S.S.G. § 2B1.1(b). So long as that harm is reasonably foreseeable, it is properly considered actual loss under the Guidelines." *James 1*, 592 F.3d at 1115 n.4.

[8] "Although we need not reach this issue, we note that the calculation of loss for sentencing purposes does not necessarily establish loss for the purpose of awarding restitution under the MVRA." *James I*, 592 F.3d at 1116 n.6.

[9] "The parties' sole disagreement is whether the $3,731,839 figure reasonably represents the actual loss resulting from Mr. James's conduct or whether gain should be used as an alternative measure of loss. Accordingly, we do not address the issue of intended loss." *James I*, 592 F.3d at 1114 n.2.

under USSG § 2B1.1(b)(1)(I). The two-level enhancement under § 2B1.1(b)(2) was not included in our mandate, the number of victims was the law of the case which went unchallenged by James, and James does not argue any of the exceptional circumstances listed above apply here. The district judge was correct in limiting the scope of resentencing. There was no procedural error.

## B.    Calculation of Loss

The district judge determined there were five lenders who incurred an actual loss totaling $1,192,567.28. James concedes a loss to Long Beach Mortgage of $95,664.01 and a loss to FMF Capital of $208,000. However, he challenges the actual losses attributed to Countrywide Home Loans, New Century Mortgage, American Home Mortgage, and First Franklin Financial. He claims the government's documentation following the history of these loans fails to demonstrate the lenders were the owners of the properties through foreclosure or account for potential gains as the loans moved through the system.

### 1.    Countrywide Home Loans

Countrywide Home Loans was an original lender for four properties secured by eight loans. The company was purchased by Bank of America in 2008. Chase submitted the affidavit of Michael Hollenbeck, senior investigator and vice president of Bank of America. The affidavit stated, "based solely on the principal amount of any loss to Countrywide/Bank of America," four of the loans resulted in an actual loss totaling $386,950.13. (R. Vol. 3 at 20.)

- 14 -

On cross-examination, Chase testified to no knowledge as to the amount Bank of America paid Countrywide when it was purchased. Consequently, the defense argued the government had not established what Bank of America, as a successor lender, paid for the individual loans at issue. In addition, James produced documents indicating two of the properties were foreclosed by Bank of New York as trustee for certificate holders of an asset-backed security pool and one was foreclosed by Deutsche Bank as indenture trustee. According to James, the government failed to prove what was paid to Countrywide when these loans were placed in the pools, and therefore, the foreclosure price was not a reasonable measure of actual loss.

2.    New Century Mortgage

The next original lender, New Century Mortgage, went out of business. Chase contacted Helen King, a former employee of New Century who had liquidated the company. In her affidavit, she stated New Century suffered a loss on only one of ten loans. The loss amounted to $84,592.97. James challenged the losses to New Century because the deeds prior to foreclosure listed "Deutsche Bank National Trust Company, as the Indenture Trustee, for the New Century Home Equity Loan Trust" as the holder of the certificate of purchase. (R. Vol. 1 at 580.) He claimed there must have been some transaction which was unaccounted for in the affidavit.

3.    American Home Mortgage

American Home Mortgage Acceptance was the original lender on two loans relating to one property. American Home Mortgage Acceptance declared bankruptcy in August 2007. Chase contacted Roger Kistler, the assistant vice president in records

- 15 -

management at American Home Mortgage Servicing, Inc., the company holding the original records after the bankruptcy. Kistler's affidavit stated the two loans had five payments made toward each loan prior to foreclosure. The combined total loss on the loans was $237,084.17. James found documents which again indicated Deutsche Bank was the holder of American Home Mortgage property and again objected because the government could not prove the transfer did not result in a gain for the original lender.

4. First Franklin Financial

First Franklin Financial originally provided four loans on two properties. The affidavit of Michael Malenka, an assistant vice president at Bank of America, stated the Bank held First Franklin's loan files. Malenka combined the losses for each property and reported losses of $135,000 for the first property, and a loss of $252,000 for the second. He also stated First Franklin held the loans at the time of foreclosure. The defense challenged the First Franklin Financial losses because a status letter from its attorney stated no payments were made on either property, the properties were "sold back to First Franklin," and were currently owned by the bank. (R. Vol. 1 at 599.) Because, in James's view, the government presented no evidence regarding the statement "sold back," it had not established an actual loss. In addition, the affidavit for these properties was written by a representative of Bank of America, which acquired Merrill Lynch, which had previously acquired First Franklin. As a result, James argued the government's failure to account for the money received in the sale to successor lenders was fatal to the government's calculations.

- 16 -

None of James's challenges are persuasive. The district court was presented with affidavits from the original lenders or their successors. The testimony established Chase correctly instructed the lender representatives to only include permissible losses in the calculation. The lenders complied. This is not a case where all of the lenders reported a loss without regard to Chase's instruction. The affidavits were based on the lender's best estimate of their actual loss. As we stated in *James I*:

> We are aware that today's banking realities—the bundling of mortgages into securities, for example—may make it difficult to identify precisely the proceeds a lender received for a specific mortgage loan. The Guidelines, however, contemplate such circumstances and thus permit a district court to estimate loss "based on *available* information." U.S.S.G. § 2B1.1 cmt. n. 3(C) (emphasis added).

592 F.3d at 1116. "[W]e may disturb the district court's loss determination—and consequent Guidelines enhancement—only if the court's finding is without factual support in the record or if, after reviewing all the evidence, we are left with a definite and firm conviction that a mistake has been made." *United States v. Gordon*, 710 F.3d 1124, 1161 (10th Cir.), *cert. denied*, 134 S. Ct. 617 (2013) (quotation marks omitted). The district judge carefully considered the information before it, parsed through each offer of proof, and found many of the affidavits to be reliable and sufficient proof of loss. James presented no evidence actually repudiating the affidavits.[10] "The credibility of a witness

---

[10] At best, it appears James's challenges demonstrate that, at this stage of the proceedings, the district court would not be able to reasonably determine the amount of loss and the appropriate measure would be as James originally urged—the over-$2 million gain he admittedly received from his criminal endeavors. The same sentence would result.

- 17 -

whose testimony is relied upon at sentencing is for the sentencing court to analyze." *United States v. Ivy*, 83 F.3d 1266, 1289 (10th Cir. 1996).

After two appeals and two sentencings we come back to what the parties originally contemplated—a sentence of 108 months in prison. Along the way James fortuitously benefited from a ridiculously small victim restitution order. The result here may not be ultimately fair, but any unfairness was visited on others, not James.

AFFIRMED.

**Entered by the Court:**

**Terrence L. O'Brien**
United States Circuit Judge

11-1270, *United States v. James*

**MATHESON**, J., dissenting.

I agree we may not disturb the district court's loss calculations under U.S.S.G. § 2B1.1(b). *See United States v. Gordon*, 710 F.3d 1124, 1161 (10th Cir.), *cert. denied*, 134 S. Ct. 617 (2013). I therefore join that portion of the majority's order and judgment.

I would, however, reverse and remand regarding Mr. James's two-level sentencing enhancement under U.S.S.G. § 2B1.1(b)(2)(A), which applies to crimes affecting ten or more victims. Despite determining that only five banks had suffered financial loss as a result of Mr. James's fraudulent actions, the district court concluded it lacked discretion under our mandate in *James I* to reconsider the two-level enhancement for crimes involving ten or more victims. *See* ROA, Vol. III at 148-49 ("It's not that I don't find merit in your argument, but I think I'm hamstrung based on the language of the Tenth Circuit opinion."). This was procedural error because the court did have discretion to address that issue.

Under our mandate rule, "resentencing [on remand] may proceed de novo," *United States v. West*, 646 F.3d 745, 749 (10th Cir. 2011), unless this court has "specifically" limited the scope of remand, *id.* at 748 (quoting *United States v. Moore*, 83 F.3d 1231, 1234 (10th Cir. 1996)). Accordingly, "the scope of the mandate on remand in the Tenth Circuit is carved out by exclusion: unless the district court's discretion is specifically cabined, it may exercise discretion on what may be heard." *Id.* at 749.

In *James I*, we concluded the district court miscalculated the loss caused by Mr. James's actions and instructed the district court to "recalculate the actual losses of the ten

original lenders it identified as victims of Mr. James's conduct." 592 F.3d at 1116. We further instructed the court that if it "finds that the original lenders have suffered an actual loss, but that the loss cannot reasonably be determined, it shall explain this finding, and shall use gain as an alternative measure of loss." *Id.* (citation omitted).

Although the specificity of our mandate in *James I* precluded plenary resentencing, it did not expressly prohibit the district court from reconsidering issues inextricably entwined with or arising out of its new actual loss calculation under § 2B1.1(b)(1)—such as whether Mr. James's conduct had, in fact, claimed ten victims as required by § 2B1.1(b)(2)(A).

In fact, by instructing the district court to recalculate actual losses, which in turn determines the number of victims, this court effectively instructed the district court to reconsider its determination that the ten original lenders were victims of Mr. James's conduct. *See* U.S.S.G. § 2B1.1 cmt. n.1 (defining "[v]ictim," as "any person [including individuals, corporations, and companies] who sustained any part of the *actual loss determined under subsection (b)(1)*" (emphasis added)); *see also United States v. Leach*, 417 F.3d 1099, 1107 (10th Cir. 2005) ("Because the loss suffered by these 200 donors was not part of the actual loss determined by the court under U.S.S.G. § 2B1.1(b)(1)(F), the district court erred by counting the donors as 'victims' for purposes of an enhancement under U.S.S.G. § 2B1.1(b)(2)."); *United States v. Abiodun*, 536 F.3d 162, 169 (2d Cir. 2008) ("[T]he District court erred as a matter of law when including these individuals among the tally of defendants' victims because the losses attributable to these victims were not included in the loss calculation."); *United States v. Armstead*, 552 F.3d

769, 780-81 (9th Cir. 2008) (same).

On remand, the district court recalculated actual loss for only five original lenders and declined to use gain as an alternative measure of loss. Given these calculations, the district court erred in concluding it lacked discretion under our mandate to reconsider the two-level enhancement for crimes involving ten or more victims. I would remand for the district court to reconsider Mr. James's enhancement under § 2B1.1(b)(2)(A), consistent with the foregoing.