**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**March 23, 2011**

**Elisabeth A. Shumaker**
**Clerk of Court**

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

WILDOR WASHINGTON, SR.,

Defendant - Appellant.

No. 10-3144

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**(D.C. No. 2:09-CR-20107-JWL-1)**

---

Christopher Pudelski of Law Offices of Christopher R. Pudelski, Washington, D.C., for Defendant - Appellant.

D. Christopher Oakley, Assistant United States Attorney, (Barry R. Grissom, United States Attorney, on the brief), Kansas City, Kansas, for Plaintiff - Appellee.

---

Before **KELLY**, **BALDOCK**, and **HARTZ**, Circuit Judges.

---

**KELLY**, Circuit Judge.

---

Defendant-Appellant Wildor Washington, Sr. was convicted of conspiracy to commit wire and mail fraud, 18 U.S.C. §§ 371, wire fraud, 18 U.S.C. §§ 2, 1343, and commercial carrier fraud, 18 U.S.C. §§ 2, 1341. He was acquitted of

making a false statement to a federal investigator and money laundering. Mr. Washington was sentenced to 36 months' imprisonment and three years' supervised release. On appeal, he argues (1) the evidence was insufficient on the commercial carrier fraud count because use of the carrier was not essential to the scheme, occurring after the purpose of the scheme had been completed; and (2) his sentence was improperly increased based upon a loss calculation that included losses incurred by assignees of original loans. Aplt. Br. 1-2. Our jurisdiction arises under 28 U.S.C. § 1291 and 18 U.S.C. § 3742(a) and we affirm.

Background

Mr. Washington, serving as a mortgage broker, assisted Emma Jean Holmes in the purchase of three houses in Overland Park, Kansas. Doc. 125 at 2. The loan applications overstated Ms. Holmes's income and included other misstatements. 1 R. 84. Upon nonpayment of the loans, foreclosure proceedings ensued. As part of those proceedings, each property was auctioned at a sheriff's sale and acquired by the lender or an assignee and then resold on the open market.

The basis for the commercial carrier fraud charge was a September 2004 transaction where closing documents were sent to the lender via Federal Express. See Aplt. Br. 9. At trial, Denise Robinett, a closing agent for the Kansas Secured Title company who handled the September 2004 transaction, testified that it was standard industry practice to send closing documents overnight via Federal

Express.  See id. at 11-12.  She also testified that there was nothing unique about this particular transaction that required overnight delivery via commercial carrier. Id. at 12.  Mr. Washington had not requested that Robinett use Federal Express for this transaction, id. at 13, and he argued that the scheme had already reached fruition once Ms. Holmes received the loan money and title to the property; the subsequent mailing of the closing documents was not in execution of the scheme to defraud.

Following his conviction, Mr. Washington filed a motion for judgment of acquittal, which included the argument that the evidence was insufficient on the commercial carrier fraud count.  Id. at 15.  In a June 2, 2010, order the district court denied the motion as to the commercial carrier charge, reasoning that "[i]f the fraudulent scheme was to procure the loans, then the scheme reached fruition only once all the requirements for obtaining the loan were satisfied."  United States v. Washington, 724 F. Supp. 2d 1122, 1136 (D. Kan. 2010).  Because mailing the form was a required step in the process of obtaining the loan, the court reasoned, it "would have been contemplated by Mr. Washington and Ms. Holmes at the time that they sought to obtain the loan."  Id. at 1138.  In addition, even assuming the scheme was complete upon Ms. Holmes's receipt of the loan money and title, the sending of the closing documents here "lulled the lender into a false sense of security."  Id. at 1137 (citing United States v. Maze, 414 U.S. 395, 403 (1974); United States v. Lane, 474 U.S. 438, 451-52 (1986)).

In challenging his sentence Mr. Washington asserts that assignment of any loans prior to the final sale of foreclosed properties should have been taken into account in the loss calculation. Mr. Washington participated in four mortgage transactions involving three properties. The foreclosure records reflect that some of the loans involved in these transactions may have been assigned prior to foreclosure. See 1 R. 305-06. At least one was sold with recourse such that National Cities, the original lender, purchased back the loan pursuant to agreement with the purchaser. See 2 R. 751. There was also some evidence that one or more of the other loans may have continued in the hands of or reverted back to the original lenders. Id. at 793.

At the sheriff's sale the lenders (original or assigned) "bid in" the property for the amount owed on the outstanding loan so that they could complete the foreclosure process and sell the properties. See id. at 748-49. The final sale price following foreclosure was used to determine the value of the collateral, i.e., Loss = (amount owed to original lender) - (amount received from downstream purchaser on open market following foreclosure). Aplt. Br. 17. Mr. Washington challenges this calculation on the grounds that it includes losses not attributable to him as well as losses of assignees to the original loans, which, he argues, is contrary to our holding in United States v. James, 592 F.3d 1109 (10th Cir. 2010).

Discussion

A.    Sufficiency of the Evidence

We review sufficiency of the evidence challenges de novo, viewing the

evidence in the light most favorable to the government to determine whether any

reasonable trier of fact could conclude that Mr. Washington was guilty beyond a

reasonable doubt.  United States v. Mullins, 613 F.3d 1273, 1279 (10th Cir.

2010).

Title 18 U.S.C. § 1341 makes it a crime to use the mails or a common

carrier to carry out a scheme to defraud or obtain money or property.  "To

establish guilt under the mail-fraud statute, the government had to prove that (1)

[Mr. Washington] engaged in a scheme or artifice to defraud or to obtain money

by means of false and fraudulent pretenses; (2) he did so with the intent to

defraud; and (3) he used [a private or commercial interstate carrier] to facilitate

that scheme."  United States v. Chavis, 461 F.3d 1201, 1207 (10th Cir. 2006)

(internal quotation marks, alteration, and citations omitted).

Mr. Washington asserts that where the commercial agent's use of a

commercial carrier is not an essential part of a scheme, then evidence of the use

of Federal Express to send the closing documents in a fraudulent scheme is

insufficient for conviction of commercial carrier fraud.  This argument finds no

support in our precedent.  It suffices that Mr. Washington knew of the industry

custom of overnighting closing documents by way of commercial carrier.  "To be

part of the execution of the fraud . . . the use of the mails need not be an essential element of the scheme. It is sufficient for the mailing to be incident to an essential part of the scheme or a step in the plot." Schmuck v. United States, 489 U.S. 705, 710-11 (1989) (internal quotation marks and citations omitted); see, e.g., United States v. Parker, 553 F.3d 1309, 1319 (10th Cir. 2009). To be actionable, the use of the mails must be "part of the execution of the scheme as conceived by the perpetrator at the time," and, where the perpetrator does not personally effect the mailing, it will suffice "if the perpetrator 'does an act with knowledge that the use of the mails will follow in the ordinary course of business, or where such use can reasonably be foreseen, even though not actually intended.'" United States v. Weiss, 630 F.3d 1263, 1269 (10th Cir. 2010) (quoting Pereira v. United States, 347 U.S. 1, 8-9 (1954)). Here it was well within reason for the jury to conclude that Mr. Washington was knowledgeable of industry practices such that he would foresee the use of Federal Express in closing.

B.     Loss Calculations

We review sentences under an abuse of discretion standard for procedural and substantive reasonableness. United States v. Sutton, 520 F.3d 1259, 1262 (10th Cir. 2008). Under this standard factual findings regarding loss calculations are reviewed for clear error and loss calculation methodology de novo. James, 592 F.3d at 1114.

U.S.S.G. § 2B1.1(b) increases a defendant's base offense level for fraud according to the amount of the loss. The court is instructed to use the greater of actual or intended loss. U.S.S.G. § 2B1.1 cmt. n.3(A). The Sentencing Guidelines define "actual loss" as "the reasonably foreseeable pecuniary harm that resulted from the offense." U.S.S.G. § 2B1.1 cmt. n.3(A)(i); see, e.g., Sutton, 520 F.3d at 1263. If the loss is not reasonably determinable, then a court must use the gain that resulted from the fraud as an alternative measure. U.S.S.G. § 2B1.1 cmt. n.3(B). "The defendant's gain may be used only as an alternate estimate of that loss; it may not support an enhancement on its own if there is no actual or intended loss to the victims." United States v. Galloway, 509 F.3d 1246, 1252 (10th Cir. 2007) (internal quotation marks and citations omitted).

On appeal, Mr. Washington does not challenge the factual findings of the district court. The district court concluded that downstream purchasers of mortgages were victims of the mortgage fraud and that their losses were foreseeable to Mr. Washington, a veteran of the real estate industry. 2 R. 829. We therefore proceed to consider the methodology employed by the district court.

Where a lender has foreclosed and sold the collateral, the net loss should be determined by subtracting the sales price from the outstanding balance on the loan. James, 592 F.3d at 1114 (citing United States v. Swanson, 360 F.3d 1155, 1169 (10th Cir. 2004)). In making this calculation, the district court may use loss information that is supported by a preponderance of the evidence. See United

States v. Schild, 269 F.3d 1198, 1200 (10th Cir. 2001). Mr. Washington urges a bright line be drawn between losses realized by original lenders and by assignees, but we are not persuaded. Regardless of whether the subject loans were assigned prior to foreclosure, the district court's loss calculation in this case was reasonable and supported by the evidence.

Relying on our holding in United States v. James, Mr. Washington argues that losses from a mortgage fraud scheme should be calculated based on financial harm to the original lender rather than a later-acquiring entity. See 1 R. 305, 403. But James is inapposite given its facts. There, the district court found that the losses of successor lenders did not constitute reasonably foreseeable pecuniary harm because the defendant had no knowledge or input regarding the original lender's decision to resell the loans. James, 592 F.3d at 1112. This finding went unchallenged on appeal. Id. at 1115 n.3. Given the district court's factual findings in James, there we considered only the losses incurred by the original lenders and concluded that because most of the original lenders sold the loans to successors prior to foreclosure, the loss to the original lenders was "the difference between the outstanding balance on the original loan and what the lender received when it sold the loan." Id. at 1115 (citing United States v. Smith, 951 F.2d 1164, 1167 (10th Cir. 1991)).

Here, however, the district court concluded it was foreseeable to Mr. Washington, given his experience in the industry, that the loans would be sold

and/or repackaged. Therefore it is appropriate to include the loss incurred by intermediary lenders in the loss calculation. See James, 592 F.3d at 1115 n.4; id. at 1117 (Lucero, J., concurring).

Mr. Washington also argues that the loss realized in the sale of these properties is not attributable to his fraud and, therefore, not properly included in the loss calculation. See Aplt. Br. 44-48. But in a mortgage fraud scheme such as this, the loss is not the decline in value of the collateral; the loss is the unpaid portion of the loan as offset by the value of the collateral. Other courts have acknowledged this distinction. Thus in United States v. Turk, 626 F.3d 743 (2d Cir. 2010), the court explained that "a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit. At any given time, the buildings in this case were nothing more than insulation against loss." Id. at 751. Likewise, in United States v. Parish, 565 F.3d 528 (8th Cir. 2009), the court remarked that "[t]he appropriate test is not whether market factors impacted the amount of loss, but whether the market factors and the resulting loss were reasonably foreseeable." Id. at 535 (citing U.S.S.G. § 2B1.1 app. n. 3(A)(1)). Although the victims of such a scheme may be able to recoup some of their loss by selling the collateral, the initial transactions would not have occurred, let alone in the amount they did, but for perpetration of the fraud.

Here the district court considered reasonable evidence of the losses resulting from the subject transactions and evidence that such losses were

foreseeable to Mr. Washington.  <u>See</u> U.S.S.G. § 2B1.1 cmt. n. 3(C).  It did not err in calculating the loss amount.

AFFIRMED.