FILED
United States Court of Appeals
Tenth Circuit

May 21, 2012

Elisabeth A. Shumaker
Clerk of Court

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

STEVEN R. ANDERSON, SR.,

Defendant-Appellant.

No. 11-3256

(D.C. No. 2:10-CR-20139-KHV-1)
(D. Kan.)

---

ORDER AND JUDGMENT[*]

---

Before **BRISCOE,** Chief Judge, **McKAY** and **HARTZ**, Circuit Judges.

---

This is a direct criminal appeal in which Steven R. Anderson, Sr. raises one issue:

Did the district court err in ordering that he pay $78,478.40 in restitution to the Social

Security Administration (SSA)? We have jurisdiction under 28 U.S.C. § 1291.

Anderson pleaded guilty to one count of making a false statement in violation of

18 U.S.C. § 1001, and the government dismissed a second count against him for Social

Security fraud under 42 U.S.C. § 408(a)(4). The district court sentenced Anderson to five

years of probation and, based on a letter in which the SSA had informed Anderson that it

---

[*] This order and judgment is not binding precedent, except under the doctrines of
law of the case, res judicata, and collateral estoppel. It may be cited, however, for its
persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

overpaid him by $78,478.40, the district court ordered restitution in that amount. Anderson does not challenge his conviction or the terms of his probation, but he does argue that the district court erred in ordering restitution. Because the government failed to prove that Anderson's false statement caused any actual loss, we reverse and remand with directions to vacate the imposition of restitution.

## I.

Anderson, a man in his early forties who suffers from bipolar disorder, applied for Social Security Disability Insurance (SSDI) benefits on October 18, 1999. The SSA approved his application retroactively to November 10, 1997, concluding that he had been under a disability and unable to engage in substantial gainful activity since that date.

In early 2007, the SSA received an anonymous tip that Anderson was working at Ed's Auto Sales, a used car lot. In March 2007, an SSA employee called the dealership and spoke with Anderson about purchasing a car. She learned that Anderson's girlfriend, Robin Bonner, owned Ed's Auto Sales.

In April 2007, Anderson filled out a work activity report at the SSA's request. He stated that he did not do any work at Ed's Auto Sales, though he did sit in the office in case someone stopped by to drop off a check or pick up a car. He also explained that he lived with Bonner and occasionally helped her with the business. He said that he was listed as a salesman at Ed's, but only so that he could drive vehicles with dealer tags for personal use. The SSA asked him to bring in his tax returns for the last few years, but he did not do so. In July 2007, the SSA determined that Anderson was no longer eligible for

benefits. Anderson's Presentence Investigation Report (PSR) does not indicate that he received any benefits after 2007.

Two agents of the SSA Office of the Inspector General (SSA-OIG) interviewed Anderson in February 2008. Anderson provided a signed, sworn statement that he did not work at Ed's Auto Sales. He did say, however, that he sometimes stayed at the business and watched television, answered the phone, or made copies of a driver's license when a potential buyer wanted to test drive a vehicle. He also said that his uncle worked on some cars there and that he would sometimes hand him tools. Anderson stated that he was not paid for any of these activities. Over the course of the interview, Anderson acknowledged that he had moved cars around the lot, aired up tires, taken payments, and given people keys for test drives. He reiterated that he was only listed as a salesman so that he could drive a car with dealer tags.

The SSA subsequently obtained an application Anderson had submitted to the Kansas Department of Revenue to become a licensed salesperson, in which he had certified that he was employed by Ed's Auto Sales. The license had been issued to him on November 29, 2006. The SSA also learned that Anderson was listed as an authorized purchaser of vehicles at an auto auction. He had purchased 112 vehicles from the auction between June of 2004 and September 2008.

In light of this information, the SSA determined that Anderson had ceased to be entitled to benefits in 2002 and calculated the overpayments he had received since that date at $119,094. On November 4, 2010, a two-count indictment was filed charging

3

Anderson with (I) Social Security fraud under 42 U.S.C. § 408(a)(4); and (II) making a false statement in violation of 18 U.S.C. § 1001. The first count alleged that Anderson concealed and failed to notify the SSA of his work activities. The second count arose out of Anderson's sworn statements to the SSA-OIG agents in February 2008. Anderson pleaded guilty to making a false statement and the Social Security fraud count was dismissed.

The PSR asserted, based on the SSA's overpayment calculations, that Anderson should be held responsible for paying the SSA $119,094 in restitution. Anderson objected. Although he acknowledged that he had done work and lied about it, he disputed that any of his work rose to the level of "substantial gainful activity" under the SSA's regulations. Therefore, he asserted that he never ceased to be entitled to benefits. He argued that the SSA should never have rescinded his eligibility, and therefore, he had received no overpayments, the SSA had suffered no loss, and he owed no restitution. Anderson also questioned the PSR's loss calculations in the specific amount of $119,094.00. He noted that the "SSA ha[d] asserted in the past that Mr. Anderson and his son were overpaid in the amount of $78,478.40." ROA, Vol. 3 at 29.

The district court held two separate sentencing hearings. At the first hearing, on July 12, 2011, the government called two witnesses to explain how the SSA had determined that Anderson engaged in substantial gainful activity and how it had calculated his overpayments. Neither witness was able to do so.

The first witness, Sandra McKinzie, was an SSA technical expert who assisted

4

SSDI applicants, investigated claimants' eligibility, and verified overpayment calculations. She had been involved with Anderson's case when he appealed the SSA's administrative determination that he owed an overpayment. She testified at first that if an employee receiving disability benefits earned more than $1000 a month, the SSA would consider the individual to have engaged in substantial gainful activity and terminate his or her benefits. Id., Vol. 2 at 17–18. McKinzie acknowledged that there was no evidence Anderson had been paid for his work, but said that the SSA would have looked at whether "in terms of all relevant factors such as hours, skills, [and] energy, [Anderson's work was] comparable to that of unimpaired individuals in the same community engaged in the same or similar business as their means of livelihood." Id. at 24.

On cross examination, McKinzie said the SSA would have determined Anderson's "countable income" by applying "three tests."[1] She said, however, that Anderson would have been considered to be "unpaid help," and the SSA would have taken into account "the reasonable monetary value" of work he did. Id. at 26–27, 29. As Anderson's counsel continued to inquire into the matter, McKinzie acknowledged that she was

---

[1] The "countable income test," set forth at 20 C.F.R. § 404.1575(e), applies to self-employed individuals who have been entitled to and received benefits for at least twenty-four months. The regulations state that SSA will determine whether such an individual's work constitutes substantial gainful activity solely by determining whether his or her monthly countable income averages more than a certain dollar amount. See id. § 404.1575(e)(3) (citing earning guidelines at § 404.1574(b)(2)). The SSA's method of calculating countable income is explained at 20 C.F.R. § 404.1575(c)(1).
The "three tests," by contrast, are used to evaluate a self-employed individual's work activity when he or she initially applies for SSDI benefits and before that individual has received benefits for more than twenty-four months. See id. § 404.1575(a).

"getting confused," and asked for a break to review Anderson's file. Id. at 38. After a brief recess, McKinzie explained that she in fact did not know what test had been applied—or should have been applied—in Anderson's case. She noted that her involvement with the case had come in near the end, and that it was "a very complicated case." Id. at 44.

The government's second witness, Special Agent Donald Krahn, had been involved with the Anderson investigation from the beginning. Krahn discussed the work that Anderson had done at Ed's Auto Sales, and explained how he had independently calculated Anderson's overpayments. He had calculated that Anderson began working in April 2003 and ceased to be entitled to SSDI benefits in May 2004. He calculated total overpayments of $76,299.60.

Krahn testified that the countable income test could not have been used in Anderson's case, because the SSA "ha[d] no information that Mr. Anderson was paid" for his work at Ed's Auto Sales. Id. at 60. He was unable, however, to say what test should have been used. He did explain that he had independently concluded that Anderson was involved in substantial gainful activity, but he said that his determination was "not official" and that he "didn't use a test per se." Id. at 61. Rather, he said he "look[ed] at whether or not Mr. Anderson had worked for hourly [sic], the amount of work that he did, any wages that could be attributed to him, any wages that were attributed Ed's Auto Sales, any earnings that could be attributable to him." Id. Nonetheless, he admitted that he had "made no determination about monetary amounts of Mr. Anderson's worth to Ed's

6

Auto Sales." Id.

After the witnesses had been excused, the court said, "I thought the testimony was extremely difficult to follow about how the Social Security Administration calculated that he engaged in some substantial gainful activity." Id. at 77. The court also questioned the extent to which income from Ed's Auto Sales could be imputed to Anderson, given that no one knew how much time he spent working there. Id. at 79–80. But the court also said, "I question whether this criminal prosecuting [sic] is the venue where the parties are required to litigate the entitlement to Social Security benefits." Id. at 92.

The district court held a second sentencing hearing on August 16, 2011. There, the parties discussed substantial gainful activity very little, focusing instead on whether, for purposes of loss calculation under the Sentencing Guidelines, the court could consider "intended loss," or only "actual loss." Id. at 102–14. The court concluded that "under the guidelines as a whole, loss includes both actual loss and intended loss." Id. at 102. It further concluded that when Anderson made false statements to the government about his work, he intended to interfere with the SSA's investigation and prevent the SSA from taking away the benefits he had been receiving. Thus, the court reasoned that all of the benefits Anderson had received while working constituted intended loss. It calculated Anderson's Guidelines offense level at twelve, based on a loss calculation in the range of $70,000 to $120,000. When the government asked the court to clarify its loss determination, the court said, "my finding is the intended loss was $119,094. It could be 78,478. It wouldn't make any difference." Id. at 126.

7

The parties also discussed restitution. Here, the government argued that an actual loss of $78,478.40 had been proven because Anderson had received a letter from the SSA stating that he was responsible for overpayments in that amount. The government produced no evidence to support this calculation. It simply argued that "Social Security in sending out that letter made the determination that the defendant was engaged in substantial gainful activity and I think that finding, it should be given deference by the Court. They are the ones that are engaged in this type of work." Id. at 125.

Addressing Anderson's counsel, the court asked "What about that argument . . . ? I mean, I know you think that the Social Security Administration didn't apply their own regulations correctly and so forth, but this is not really the venue to make that decision." Id. at 126. Anderson disagreed. He insisted that restitution—unlike sentencing level calculations—could only be based on actual loss, and that actual loss could only have occurred if Anderson had received money to which he was not entitled. This, he argued, had never been proven.

The court sentenced Anderson to five years of probation, and ordered him to make restitution in the amount of $78,478.40. Anderson stated that he would object "to the Court's finding of the use of intended loss according to the guidelines and the finding of intended loss for Mr. Anderson in this case in particular, as well as the restitution." Id. at 129. The court then clarified, "Well, when I'm talking about restitution . . . I'm talking about actual loss." Id. Anderson stated he would object to this as well.

8

**II.**

On appeal, Anderson argues that the district court erred in ordering restitution. "[A] district court that orders restitution in an amount greater than the total loss caused by the offense thereby exceeds its statutory jurisdiction and imposes an illegal sentence." United States v. Hudson, 483 F.3d 707, 710 (10th Cir. 2007) (quotations and alterations omitted). Because no actual loss was proven in this case, we agree with Anderson that the court lacked authority to order restitution.

We review de novo the district court's determination that restitution was legally authorized. See United States v. Nichols, 169 F.3d 1255, 1278 (10th Cir. 1999) ("We review the legality of a restitution order de novo."). We also review de novo the district court's loss calculation methodology. United States v. Washington, 634 F.3d 1180, 1184 (10th Cir. 2011). "Factual findings underlying a restitution order are reviewed for clear error and the amount of restitution for an abuse of discretion." Id.

The district court was authorized to order restitution under the Mandatory Victims Restitution Act (MVRA), 18 U.S.C. § 3663A, only if the SSA suffered an actual loss as a result of the false statement for which Anderson was convicted.[2] See United States v.

_____

[2] We note, as an initial matter, that nothing in the record suggests Anderson was still receiving benefits in February 2008 when he made the false statement at issue in this case. Thus, we question how his statement could have possibly caused the SSA any actual loss. If "the district court included as restitution losses not attributable to [Anderson]'s offense of conviction, the court exceeded its statutory authority." United States v. Diamond, 969 F.2d 961, 965 (10th Cir. 1992).

Anderson, however, raised this point for the first time at oral argument. Although "[c]hallenges to a district court's subject matter jurisdiction may be raised at any time,"

(continued...)

9

Gordon, 480 F.3d 1205, 1211 (10th Cir. 2007) ("The MVRA, which amended the [Victim and Witness Protection Act (VWPA), 18 U.S.C. § 3663] in 1996, did not change the general rule that restitution may only be ordered for losses caused by the offense of conviction."). The government—in this case the SSA—can be a "victim" under the MVRA. United States v. Barton, 366 F.3d 1160, 1166 (10th Cir. 2004). To show that the SSA suffered an actual loss, the government had to prove by a preponderance of the evidence that Anderson received benefits for which he was not eligible. United States v. Gallant, 537 F.3d 1202, 1247 (10th Cir. 2008).

The SSA determined in the late 1990s that Anderson was unable to engage in substantial gainful activity, and was therefore entitled to SSDI benefits. In 2007, the SSA concluded that he had in fact engaged in substantial gainful activity, and therefore was no longer disabled. At Anderson's sentencing hearings, the government could not show how the SSA reached this conclusion.

As the government's first witness acknowledged, this was a complicated case. Under the applicable regulations, Anderson should not necessarily have lost his eligibility for SSDI benefits simply because he helped out at his girlfriend's used car dealership. In the absence of helpful briefing from the parties, we do not purport to provide an authoritative analysis of the regulations here. But we observe that the government's

---

[2](...continued)
United States v. Burch, 169 F.3d 666, 668 (10th Cir. 1999), we need not reach this issue without the benefit of briefing from the parties because, as we explain below, the district court lacked statutory authority to order restitution for a separate reason.

witnesses themselves testified that the SSA employs a variety of tests to determine whether an individual has engaged or can engage in substantial gainful activity. See ROA, Vol. 2 at 24 (McKinzie's testimony); id. at 58 (Krahn's testimony). For example, different standards are applied to employees and self-employed individuals. See 20 C.F.R. § 404.1574 (standards for employees); id. § 404.1575 (standards for self-employed persons). For self-employed individuals, the regulations set forth three different tests to determine initial eligibility for benefits, which focus on the nature of the work and its value to the individual's business. See id. § 404.1575(a)(2); see generally Rupe v. Chater, 81 F.3d 173 (10th Cir. 1996) (unpublished). They also provide a separate test, based on countable income, for self-employed persons who have received benefits for at least twenty-four months. See 20 C.F.R. § 404.1575(a)(1)(ii). For employees, the regulations focus primarily on earnings, and employees who earn below a certain threshold enjoy a presumption that they are not engaged in substantial gainful activity. See id. § 404.1574(b)(3); see generally Lewis v. Apfel, 236 F.3d 503 (9th Cir. 2001). In addition, a special rule pertains to employees who have been properly receiving benefits for at least twenty-four months. The regulations state that SSA will evaluate such employees' work solely on the basis of their earnings. See 20 C.F.R. § 404.1574(b)(3)(iii).

It is clear that after Anderson had received benefits for several years, he began to do some amount of work at his girlfriend's used car lot. It is also apparent that Anderson did not own the business, and according to the PSR, he certified to the Kansas

11

Department of Revenue that he was an employee there. Yet the government's witnesses suggested that Anderson was evaluated as a self-employed person. They could not explain why this classification was appropriate. See ROA, Vol. 2 at 34–35. Ultimately, the technical expert who had worked on Anderson's case admitted that she did not know what standard had been applied to determine he had engaged in substantial gainful activity. Id. at 39. The special agent who had investigated Anderson explained that he "didn't use a standard." Id. at 61.

Nor could either witness explain why, under any standard, Anderson's work rose to the level of substantial gainful activity. Nothing in the record suggests that he was ever paid for his time. See id. at 19 (McKinzie acknowledging SSA "did not have any evidence of wages"); id. at 69 (Krahn acknowledging that he did not "have evidence that cash exchanged hands"). As to the hours Anderson worked and the value of his labor, the government's evidence was scant, to say the least. See id. at 23 (McKinzie stating that she believed Anderson was working "[a]bove 45 hours a month," but failing to explain how she came to that conclusion); id. at 62 (Krahn's admission that he "made no determination about monetary amounts of Mr. Anderson's worth to Ed's Auto Sales"). Furthermore, Anderson had been receiving benefits for more than two years before he began working at Ed's Auto Sales. Thus, it would appear that the SSA should have determined, based on his lack of earnings, that he had not engaged in substantial gainful activity. See 20 C.F.R. § 404.1574(b)(3)(iii); id. § 404.1575(e). In any event, the evidence before the district court was insufficient to show that Anderson engaged in

12

substantial gainful activity under either a self-employed or employee standard.  Cf. Le v. Astrue, 540 F. Supp. 2d 1144, 1148–50 (C.D. Cal. 2008) (holding that individual's past unpaid work as a subsistence rice farmer did not constitute substantial gainful activity, whether she was an employee or self-employed).

Although the district court recognized that "the testimony was extremely difficult to follow about how the Social Security Administration calculated that [Anderson] engaged in some substantial gainful activity," ROA, Vol. 2 at 77, it ultimately accepted the SSA's overpayment determination, suggesting that if "the Social Security Administration didn't apply their own regulations correctly . . . this is not really the venue to make that decision," id. at 126.  Thus, the district court's restitution order, in the end, seems to have been based on little more than the fact that Anderson received a letter stating that he owed the SSA $78,478.40.

"We recognize that the determination of restitution is not an exact science and that the calculation of a loss need not be precise."  United States v. Kravchuk, 335 F.3d 1147, 1157 (10th Cir. 2003).  But the government had to establish in the first instance that there was a loss because "a district court may not order restitution in an amount that exceeds the actual loss caused by the defendant's conduct."  United States v. James, 564 F.3d 1237, 1243 (10th Cir. 2009).  In this case, the existence of an unsubstantiated letter stating an overpayment amount did not satisfy the government's burden of proving by a preponderance of the evidence that Anderson received SSDI benefits to which he was not entitled.  Cf. McCarthy v. Apfel, 221 F.3d 1119, 1126 (9th Cir. 2000) (holding in a civil

13

case that a determination letter from the SSA did not constitute substantial evidence that would satisfy the Commissioner's burden of proving the amount of overpayments). Because the government failed to prove that the SSA suffered any actual loss, the district court was without statutory authorization to order restitution. See Hudson, 483 F.3d at 710.

## III.

We REVERSE and REMAND with directions for the district court to vacate the imposition of restitution.

Entered for the Court

Mary Beck Briscoe
Chief Judge