**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

PETER VINCENT CAPRA,

    Defendant - Appellant.

No. 15-1000
(D.C. No. 1:12-CR-00178-RBJ-1)
(D. Colo.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **BACHARACH**, and **McHUGH**, Circuit Judges.
_____

Defendant Peter Vincent Capra owned Golden Design Group ("GDG"), a

company that built and sold homes in the Denver metropolitan area.  He was

convicted after a jury trial of fourteen counts of wire fraud, two counts of mail fraud,

and ten counts of money laundering, arising out of a scheme to defraud mortgage

_____

[*] After examining the briefs and appellate record, this panel has determined
unanimously that oral argument would not materially assist in the determination of
this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore
ordered submitted without oral argument.  This order and judgment is not binding
precedent, except under the doctrines of law of the case, res judicata, and collateral
estoppel.  It may be cited, however, for its persuasive value consistent with
Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

lenders.[1] Although the advisory guideline range was 210 to 262 months' imprisonment, the district court departed downward and sentenced Mr. Capra to 144 months in prison. The court also ordered restitution in the amount of $11,009,934. Mr. Capra now appeals from his convictions and sentence.[2]

I. Background

A. *The Superseding Indictment*

The Superseding Indictment charged Mr. Capra in count one with obstruction of justice related to the alleged shredding of documents that were responsive to a grand jury subpoena. The remaining counts for wire fraud, mail fraud, and money laundering, related to Mr. Capra's alleged scheme to defraud mortgage lenders. The scheme involved the submission of loan applications with false information and structuring transactions to give cash back to the buyers of GDG homes at closing without the lenders' knowledge. This scheme made it possible for GDG to sell a large volume of homes to otherwise unwilling or unqualified buyers.

---

[1] Mr. Capra was found not guilty of count one in the Superseding Indictment, which charged him with obstruction of justice.

[2] Mr. Capra's court-appointed counsel initially filed an opening brief raising one sentencing challenge and the government filed a response brief addressing that issue. Mr. Capra subsequently filed a motion seeking leave to file a pro se brief raising five challenges to the sufficiency of the evidence and additional sentencing challenges. We granted Mr. Capra's motion, accepted his pro se brief for filing, and directed the government to file a supplemental response brief. The government filed a supplemental response brief and Mr. Capra filed a pro se reply brief.

The Superseding Indictment alleged that Mr. Capra and others arranged for the buyers to submit loan applications for first and second mortgages to support their purchases of GDG homes. Many of the buyers bought multiple properties at or near the same time. Loan applications were submitted through several different mortgage brokers, including Justin Knight[3], whom Mr. Capra knew would assist with providing, or at least fail to question the accuracy of, false information submitted in connection with the applications. The applications contained materially false and fraudulent representations about the buyers' income, liabilities, source of down payment, and intent to occupy the properties as their primary residences.

According to the Superseding Indictment, Mr. Capra would arrange for distributions of cash back to the buyers in ways that prevented the lenders from discovering that these funds were actually going to the buyers. These distributions usually involved one of three methods.

Under the first method, Mr. Capra caused the disbursement of funds to limited liability companies ("LLCs") created by Brian Waring[4] or by the buyers themselves based on fraudulent invoices for those LLCs that purported to reflect additional property improvements such as landscaping or carpeting. Under the second method, Mr. Capra caused buyers to sign false documents indicating either that GDG would

---

[3] Mr. Knight worked as a loan officer for Mr. Capra's company, Distinctive Mortgages, which was an in-house mortgage company for GDG.

[4] Mr. Waring worked in the real estate business and owned a company called Red Eagle Investments.

pay for work not yet completed on the home at the time of closing or that GDG would pay the buyers in exchange for a waiver of their otherwise applicable home warranties based on alleged construction defects. In fact, either all work on the home was complete or the buyers had not identified any construction defects. GDG would then issue checks directly to the buyers immediately after closing which were not reflected in the HUD-1 closing statements.

Under the third method, Mr. Capra caused the filing, prior to closings, of a statutory lien purporting to reflect a debt by GDG to Cambridge Real Estate Consulting ("Cambridge") or Chateau Real Estate Investments ("Chateau"). These companies were sham companies that Mr. Capra ostensibly set up as marketing companies, but the companies in fact did no work marketing any of the GDG properties. At closings, funds would be distributed to Cambridge or Chateau and then Mr. Capra would cause a portion of those funds to be distributed to the buyers purchasing the properties.

In furtherance of the scheme, Mr. Capra also caused additional loan proceeds to be paid both to others helping recruit home buyers for GDG, including Mr. Waring, Benjamin Serrano[5], and Kristin (Clark) Vaughn[6], and to the people who appeared to control Cambridge and Chateau, Beverly Hemond and Donald Johnson.

---

[5] Mr. Serrano was the sales director for GDG.

[6] Ms. Vaughn brokered loans in the real estate business. She worked with Mr. Capra to market GDG properties.

4

He also caused the use of the mail and of interstate wire transmissions to transmit documents and funds related to the buyers' purchases of GDG homes. Finally, he engaged in monetary transactions involving criminally derived property from the mail and wire fraud by transferring amounts from the Cambridge bank account to Ms. Hemond's personal account.[7]

B. *Trial Testimony*

At trial, the government introduced significant evidence of Mr. Capra's role in devising and furthering the scheme to defraud the lenders. Although Mr. Waring proposed the first cash-back method to Mr. Capra, it was Mr. Capra who then took control and implemented the scheme as a way to increase the sales volume of his GDG homes. Mr. Waring, Mr. Knight, Ms. Vaughn, and Mr. Serrano all testified that Mr. Capra decided the home prices and the amount of cash going back to the buyers.

Mr. Waring testified that he discussed everything with Mr. Capra and that if he ran into a problem with a file or credit score or loan getting declined, he would talk to Mr. Capra about it. He testified Mr. Capra was very detail-oriented and focused on the financial aspects of the transactions. He further testified that Mr. Capra knew he was using false loan documents to support loan applications. Mr. Waring also explained that he was trying to get multiple loan applications for multiple properties

---

[7] Ms. Hemond testified that she was in a romantic relationship with Mr. Capra and that he was using the Cambridge bank account as a way to give her money without his wife knowing about it.

purchased by a single buyer filed within a 45-day window. The 45-day window was important because then the multiple loan applications would not show up on the buyer's credit report. He testified that Mr. Capra knew he was doing this and that Mr. Capra "instructed [him] to do whatever [he] had to do to get the loans done." R., Vol. 4 at 24.

Mr. Waring testified that he heard about a complaint from a lender involving false information on a loan application (the home was not being used as a primary residence and multiple properties had been purchased but not disclosed on the application). Although the complaint did not involve a home that was sold by GDG, it was in a neighborhood with GDG homes and the borrower owned GDG homes. Mr. Waring told Mr. Capra about the complaint and Mr. Capra told him they were going to need to change their approach.

Mr. Capra's new approach was to use voided warranties or warranty waivers. But Mr. Waring testified that he was not aware of any buyers doing walk-throughs and, in many cases, the buyers did not know what properties they owned until after they closed. He further testified that he was not aware of any buyers identifying significant problems with the GDG homes. He said he would see buyers signing the warranty waiver forms at closing and they would then receive checks directly from GDG. Mr. Knight testified that these warranty-waiver payments did not show up on the HUD-1 settlement statements. When he questioned Mr. Capra about whether the payments should be reflected on the HUD-1 statements, Mr. Capra told him they did

6

not need to be disclosed because they were simply up-front settlements on any future work that would need to be done on the houses.

Mr. Capra subsequently came up with another cash-back method using statutory liens. He had Mr. Waring sign a master marketing agreement and told him "it was a cleaner way to . . . deal with the cash at close" and that "it created additional layers." *Id*. at 55. Mr. Capra explained to Mr. Waring how the new methodology would work—statutory liens would be recorded in the name of Red Eagle (Mr. Waring's company), and then at closing, the liens would be paid off by the title company. Mr. Waring would get the money through Red Eagle and then he would keep a portion for himself and give the rest back to the buyer. Mr. Waring testified that no one at GDG knew more about the financial matters related to GDG homes than Mr. Capra.

The testimony also showed that Mr. Capra set up two sham companies— Chateau and Cambridge—to further the cash-back method using statutory liens. Ms. Hemond, who was Mr. Capra's girlfriend in Las Vegas, testified that Mr. Capra told her to set up a company (Cambridge) and to list herself as the CEO. But she testified that she "[n]ever did anything" once the company was formed. R., Vol. 3 at 1196. Mr. Capra determined the amount of liens that would be placed against the properties and he would dictate how the money should be disbursed. He directed that Ms. Hemond should receive $25,000 for every transaction involving Cambridge even though she did no work.

7

Ms. Vaughn testified that Mr. Capra used Chateau and Cambridge liens to get money to her through her investment company (K&K) and she would then disburse the money back to the buyers. Mr. Capra wanted it done that way, "[s]o it wouldn't look like [the money] was coming from the builder." *Id*. at 1483-84. She was "told to actually open up more LLCs or S [corporations] because a lot of money was just going directly into K&K." *Id*. at 1484. She and Mr. Capra also had conversations about the need to create a "paper trail" and she helped create fake invoices for Cambridge and Chateau to facilitate that process. *Id*. at 1483-84, 1486.

Mr. Serrano testified that Mr. Capra managed everything with respect to the GDG business. He stated that Mr. Capra "was very detail oriented and nothing got past him." *Id*. at 932. At various times, Mr. Knight, Ms. Vaughn and Mr. Serrano expressed concerns about the legality of some of the actions Mr. Capra was asking them to take. Mr. Capra reassured them that everything was going to be okay and they were not doing anything wrong. Mr. Capra also told them that he was acting on the advice of his attorney, Laurin Quiat. But Mr. Quiat testified that he never told Mr. Capra he could give cash back to the buyers and not disclose it on the HUD-1 settlement statements.

C. *Rule 29 Motion*

After the government rested, the defense also chose to rest its case without putting on any further evidence. At that time, the defense made an oral motion for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.

8

In the motion, defense counsel argued that there was significant proof of Mr. Capra's good faith in following the advice of Mr. Quiat, when he was using the cash-back methods described at trial. Defense counsel further asserted that because Mr. Capra was acting in good faith based on Mr. Quiat's advice, he lacked the criminal intent necessary for the jury to convict him of the mail and wire fraud counts. Defense counsel also moved for acquittal on the money laundering counts, arguing that Mr. Capra truly believed that the money he was making from GDG as a result of these methodologies was lawfully derived.

The district court denied the motion, explaining that although Mr. Quiat had approved the use of warranty waivers and the creation of Cambridge and Chateau as marketing companies, he had denied ever giving Mr. Capra advice that he could use the waivers or the marketing companies as a disguised way to funnel money back to the buyers. Although Mr. Capra's associates testified that he told them Mr. Quiat had approved these methods and the way Mr. Capra was using them, Mr. Quiat flatly denied doing so. The district court explained that the jury was going to have to determine whether Mr. Quiat's testimony was credible. And if the jury found the testimony to be credible, it would negate Mr. Capra's advice-of-counsel defense. The district court therefore determined there was sufficient evidence for the jury to find Mr. Capra guilty.

II. Discussion

On appeal, Mr. Capra challenges the sufficiency of the evidence to support his convictions. He also challenges the substantive and procedural reasonableness of his

9

sentence and the imposition of a four-level enhancement for his role as an organizer or leader.

A. *Sufficiency of the Evidence*

Mr. Capra argues that: (1) the government failed to prove that he submitted any false or fraudulent information to any lender; (2) the government failed to prove the jurisdictional elements of mail and wire fraud; (3) he did not have any legal duty or obligation of disclosure to the lenders; (4) the use of the Chateau and Cambridge liens did not violate the mail and wire fraud statutes; and (5) the government failed to prove the concealment element necessary for the money laundering charges.

The first problem with Mr. Capra's challenges to the sufficiency of the evidence is that they come too late. "The Rules of Criminal Procedure do not allow a defendant to wait until appeal to raise such a challenge." *United States v. Goode*, 483 F.3d 676, 680 (10th Cir. 2007). Rather, claims of insufficient evidence must be presented in the first instance to the district court through a Fed. R. Crim. P. 29 motion. *See Goode*, 483 F.3d at 680-81.

Although Mr. Capra's trial counsel did move for a judgment of acquittal under Rule 29, that motion was not predicated on any of the grounds Mr. Capra now raises to challenge the sufficiency of the evidence. Instead, trial counsel argued that the jury could not convict Mr. Capra because there was significant evidence that he had acted in good faith on the basis of his attorney's advice and therefore there was no criminal intent to support a guilty verdict. "When a defendant challenges in district court the sufficiency of the evidence on specific grounds, all grounds not specified in

10

the motion are waived." *Id.* at 681 (internal quotation marks omitted); *see also*

*United States v. Kimler*, 335 F.3d 1132, 1141 (10th Cir. 2003).

"Although we have described the failure to raise a challenge in district court

as a 'waiver,' it is more precisely termed a forfeiture . . . ." *Goode*, 483 F.3d at 681.

"Because of [Mr. Capra's] forfeiture we review [his challenges to] the sufficiency of

the evidence under the plain-error doctrine." *Id*. Under that doctrine, Mr. Capra

"must show: (1) an error, (2) that is plain, which means clear or obvious under

current law, and (3) that affects substantial rights." *Id*. (internal quotation marks

omitted). As we discuss below, we see no error, plain or otherwise, requiring

reversal due to insufficient evidence.

1. Wire and Mail Fraud

Mr. Capra first argues that the government failed to prove that he mailed or

wired any false information to any lender. He devotes a portion of his brief to

discussing the individual counts attempting to illustrate the lack of evidence in that

regard. But the government was not required to prove that Mr. Capra personally

mailed or wired false information. "[T]he central focus of the first element [of the

wire and mail fraud statutes] is the existence of a scheme." *United States v. Kennedy*,

64 F.3d 1465, 1475 (10th Cir. 1995). To prove that element, the government only

needed to show that Mr. Capra devised a scheme to defraud.[8] "The offense of a

---

[8] "To prove a violation of the mail [or wire] fraud statute, the government must prove . . . the devising of a scheme or artifice . . . to defraud." *Kennedy*, 64 F.3d at 1475; 18 U.S.C. §§ 1341, 1343.

scheme to defraud focuses on the intended end result, not on whether a false representation was necessary to effect the result. Schemes to defraud, therefore, may come within the scope of the [wire and mail fraud] statute[s] even absent an affirmative misrepresentation." *United States v. Cronic*, 900 F.2d 1511, 1513-14 (10th Cir. 1990), *overruled on other grounds by United States v. Iverson*, 818 F.3d 1015 (10th Cir. 2016). The government was therefore not required to show that Mr. Capra personally submitted any misrepresentations to the lenders to prove the existence of a scheme to defraud.

Mr. Capra also argues that the government failed to prove the jurisdictional elements for the mail and wire fraud statutes, which require an interstate wire transmission or a mailing in furtherance of the fraudulent scheme, *see* 18 U.S.C. § 1343 (wire fraud); *id*. § 1341 (mail fraud). But Mr. Capra's trial counsel stipulated to the facts that satisfied those jurisdictional elements. *See* R., Vol. 3 at 1816-17. "'A stipulation is an agreement between the parties as to a fact of the case, and, as such, it is evidence introduced by both of the parties.'" *United States v. Cruz-Rodriguez*, 570 F.3d 1179, 1184 (10th Cir. 2009) (*quoting United States v. Hawkins*, 215 F.3d 858, 860 (8th Cir. 2000)). "'Generally, a party introducing evidence cannot complain on appeal that the evidence was erroneously admitted.'"

12

*Id.* (*quoting Ohler v. United States*, 529 U.S. 753, 755 (2000)). We see no basis to depart from this general principle in Mr. Capra's case.[9]

The evidence at trial showed that the cash going back to the buyers was not disclosed on the HUD-1 statements. But Mr. Capra asserts that he did not violate the mail and wire fraud statutes with the use of his cash-back methods because he did not have any independent legal duty or obligation to disclose anything to the lenders. The government's expert testified at trial, however, that the HUD-1 settlement statement, which is prepared for the closing, requires any payments between the buyer and seller to be reflected on that statement. R., Vol. 3 at 1646-47. And both the buyer and seller have to sign the HUD-1 settlement statement attesting to its accuracy. *Id*. at 1647-48.

Moreover, even if Mr. Capra did not have a legal duty to the lenders to disclose the cash back to the buyers, "a misleading omission is actionable as fraud if it is intended to induce a false belief and resulting action to the advantage of the misleader and the disadvantage of the misled." *United States v. Gallant*, 537 F.3d 1202, 1228 (10th Cir. 2008) (internal quotation marks omitted). Mr. Waring told Mr. Capra that the lenders would not approve the loan applications if they knew that

---

[9] Mr. Capra also objects that the mail fraud counts are based on Federal Express shipments as opposed to mailings through the United States postal service, but the statute expressly criminalizes not only the use of the United States postal service, but also "any matter or thing" sent or delivered "by any private or commercial interstate carrier" for purposes of executing the scheme to defraud, *see* 18 U.S.C. § 1341.

13

GDG was giving money back to the buyers "because in essence you're paying the buyer to buy the property." R., Vol. 4 at 13-14. Many of the buyers did not have sufficient income or assets to qualify for the loans. By not disclosing the cash-back payments to the lenders, Mr. Capra actively concealed information that was material to the lenders in making their decisions to approve the loan applications. Such "deceitful concealment of material facts" is sufficient evidence to support Mr. Capra's wire and mail fraud convictions. *See Gallant*, 537 F.3d at 1228 (internal quotation marks omitted).

Finally, Mr. Capra contends that the use of the Chateau and Cambridge liens did not violate the mail and wire fraud statutes. But the testimony at trial established that the Chateau and Cambridge companies never marketed any properties or performed any other work related to the properties. These companies and their liens were simply used as vehicles to conceal the money going back to the buyers.

Ms. Vaughn, who worked with Mr. Capra, testified that invoices were created for Chateau and Cambridge reflecting the amount that was going back to the buyer and it was done that way to create a "paper trail" for the GDG file so that there was an invoice for every home. R., Vol. 3 at 1483. After closing, the money was wired from Chateau or Cambridge to Ms. Vaughn's company, K&K Investments. She would keep any money owed to her, and then she would wire the rest of the money to the buyer. *Id.* It was done this way so that "it wouldn't look like [the money] was coming from [GDG]." *Id.* at 1484. To her knowledge, neither Chateau nor Cambridge ever did any work to market the properties. *Id.* Both Mr. Johnson and

14

Ms. Hemond, the alleged corporate heads of Chateau and Cambridge, testified that they did no work for these companies and these companies performed no work for GDG. *See id*. at 620-624 (Johnson testimony); *id*. at 1196-1200 (Hemond testimony).

Mr. Capra also argues that he did not violate the mail and wire fraud statutes because he disclosed the Chateau and Cambridge liens to the lenders on the HUD-1 settlement statements. But the HUD-1 settlement statements did not disclose those companies actually performed no work for GDG and that a large portion of the money being paid to Chateau and Cambridge was then going back to the buyers. Mr. Capra's use of the Chateau and Cambridge companies deceitfully concealed the payments that were going back to the buyers and furthered his scheme to defraud the lenders.

2. Money Laundering

Mr. Capra argues that there was insufficient evidence to prove money laundering because the government did not show that the transfers of money from the Cambridge account to Ms. Hemond's account were designed to conceal anything. Mr. Capra relies on 18 U.S.C. § 1956 for his argument. That statute does require the government to prove that "the transaction is designed in whole or in part . . . to conceal or disguise the nature, the location, the source, the ownership or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956. But Mr. Capra was charged and convicted of violating 18 U.S.C. § 1957, which does not contain that element. Section 1957 requires the government to prove that the defendant

15

"knowingly engage[d] . . . in a monetary transaction in criminally derived property of a value greater than $10,000 and is derived from specified unlawful activity." Because § 1957 does not require the government to prove that the monetary transactions were designed to conceal anything, Mr. Capra has not shown any failure of proof regarding the money laundering counts.

B. *Sentencing issues*

Mr. Capra argues his sentence is substantively and procedurally unreasonable. We review for abuse of discretion the reasonableness of a sentence. *United States v. Martinez*, 610 F.3d 1216, 1223 (10th Cir. 2010). He also argues that the district court erred in imposing a four-level enhancement under U.S.S.G § 3B1.1 for his role as an organizer or leader of the scheme to defraud. We review for clear error the district court's factual finding to support the § 3B1.1 enhancement. *See United States v. Shengyang Zhou*, 717 F.3d 1139, 1149 (10th Cir. 2013).

1) Substantive reasonableness

Mr. Capra asserts that the length of his sentence (12 years) is substantively unreasonable. "Review for substantive reasonableness focuses on whether the length of the sentence is reasonable given all the circumstances of the case in light of the factors set forth in 18 U.S.C. § 3553(a)."[10] *United States v. Friedman*, 554 F.3d 1301, 1307 (10th Cir. 2009) (internal quotation marks omitted).

---

[10] Those factors include: "the nature and circumstances of the offense and the history and characteristics of the defendant;" "the need for the sentence imposed [:] . . . to reflect the seriousness of the offense, to promote respect for the law, and to

(continued)

16

In challenging the length of his sentence, Mr. Capra argues that he relied on the advice of counsel, Mr. Quiat, who approved the cash-back methods. He further argues that the other participants in the scheme received significantly lower sentences. As the district court pointed out, however, the jury rejected Mr. Capra's defense that he relied in good faith on Mr. Quiat's advice. As for the sentencing disparity, Mr. Capra was charged with and convicted of a significantly higher number of crimes than any other defendant who was involved in the scheme and most of the other defendants were working for him. Also, the other defendants accepted responsibility for their conduct, cooperated with the government, and entered into guilty pleas.

The government argued that a guidelines sentence (17-22 years) was appropriate. The probation office proposed a downward variance to 15 years. Ultimately, the district court rejected both of those positions and imposed an even lower sentence. The 12-year sentence the court imposed was a downward variance of 5 1/2 years (or 66 months) from the bottom of the guidelines range. The district court spent time at sentencing discussing the § 3553 factors with respect to Mr. Capra, providing reasons to support the sentence it imposed. Mr. Capra has

provide just punishment for the offense; to afford adequate deterrence to criminal conduct; [and] to protect the public from further crimes of the defendant;" "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct;" and "the need to provide restitution to any victims of the offense." 18 U.S.C. § 3553(a).

17

failed to show how the district court abused its discretion in imposing his 12-year sentence.

2) Procedural reasonableness

Mr. Capra argues that the district court incorrectly calculated the loss amount for purposes of determining his offense level under U.S.S.G. § 2B1.1 and the amount of the restitution award ($11,009,934). In general, alleged errors in calculating the sentence implicate the procedural reasonableness of the sentence. *See, e.g.*, *United States v. Alapizco-Valenzuela*, 546 F.3d 1208, 1214 (10th Cir. 2008).

Before we can consider these issues, we must address whether they were raised below. Mr. Capra initially appeared to challenge the district court's loss calculation in his motion for a departure and variance. *See* R., Vol. 1 at 197-98. But at the sentencing hearing when the government was prepared to prove the loss amounts, defense counsel told the court, "[w]e do not contest the figures that are contained in the exhibit to the Government's sentencing motion." *id*., Vol. 3 at 111. Those figures reflected the loss amounts, broken out by lender, and are contained in the presentence report. Because Mr. Capra withdrew his objection to the loss calculations and did not object at sentencing to the restitution award, we review those issues for plain error.

On appeal, Mr. Capra argues that the losses were not a result of his actions. He claims the losses were "the result of actions of others,"[11] or were "due to the

---

[11] Although Mr. Capra seeks a reduction in his loss amount due to the allegedly fraudulent actions of the lenders and the buyers, he is responsible for all reasonably foreseeable acts and omissions of others in furtherance of a jointly

(continued)

18

market crash resulting from the recession." Pro Se Opening Br. at 73. He also claims the loss amounts failed to take into consideration "other sources of payments to the lenders," such as receipt of mortgage payments made by buyers, bankruptcy payments, and "short sales." *Id*. at 74.

Under U.S.S.G. § 2B1.1(b), a defendant's base offense level for fraud is increased according to loss. The court should use the greater of actual or intended loss. *Id*. § 2B1.1, cmt. n. 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id*., cmt. n. 3(A)(i). "'Reasonably foreseeable pecuniary harm' means pecuniary harm that the defendant knew, or under the circumstances, reasonably should have known, was a potential result of the offense." *Id*., cmt. n. 3(A)(iv).

Losses attributable to mortgage fraud are determined by subtracting the sale prices of the homes from the outstanding loan balances. *See United States v. Washington*, 634 F.3d 1180, 1184 (10th Cir. 2011). Although Mr. Capra contends that the district court did not take into account mortgage payments made by the buyers or payments received from the bankruptcy estate, the methodology approved in *Washington*—which was used without objection in this case—already takes into account the payments received by the lenders because it uses the outstanding loan balances.

---

undertaken criminal activity, *see* U.S.S.G. § 1B1.3(a)(1)(B). The fact that others helped Mr. Capra to carry out deceitful actions in furtherance of the scheme does not absolve him of responsibility for the losses.

Mr. Capra further contends that market conditions caused a decline in the value of the properties and should be considered in determining actual loss. In *Washington*, 634 F.3d at 1185, we noted that "in a mortgage fraud scheme . . . , the loss is not the decline in value of the collateral; the loss is the unpaid portion of the loan as offset by the value of the collateral." *Id*. Only the unpaid portion of the loan needs to be foreseeable, whereas the credits against the loss, such as the proceeds from a foreclosure sale, do not need to be foreseeable. *See Crowe*, 735 F.3d at 1237-38.

Mr. Capra is not entitled to a reduction in the actual loss amount due to any diminished value of the credit against the loss from market or other economic conditions. It was reasonably foreseeable to Mr. Capra that his fraudulent scheme could cause the lenders to lose the unpaid loan balances. This is so because "an unqualified borrower's default is clearly a reasonably foreseeable potential result of the offense." *Id*. at 1238 (internal quotation marks omitted). As for any credit against the loss from the sale of the properties, courts deduct from the calculated loss the amount actually recovered. *Id*. "This calculation is made as of the time of sentencing and without regard for whether this amount was reasonably foreseeable." *Id*. at 1238-39 (internal quotation marks omitted). Mr. Capra is therefore "only entitled to a credit against loss in the amount actually recovered by the banks from the sale of the subject properties." *Id.* at 1239 (internal quotation marks omitted).

Mr. Capra also challenges the restitution award. He argues that restitution awards must be based on actual losses to victims and he asserts that the award "does

not reflect actual loss to downstream note holders, because they could have paid less [than] the unpaid balance to acquire the loans and notes." Aplt. Pro Se Br. at 76. He relies on our recent decision in *United States v. Howard*, 784 F.3d 745 (10th Cir. 2015) to support his position.

In *Howard*, there was evidence that some of the mortgage notes had been sold by the original lenders to downstream lenders. *Id*. at 747. In the district court, the defendant asserted that the restitution calculations "were flawed because they did not examine the purchase prices paid by downstream holders of the mortgage notes." *Id*. at 751. The government did not put on evidence in response to defendant's argument and, on appeal, the defendant challenged the method of calculating loss to the downstream lenders as it related to the restitution award. *See id*. at 749, 751. We ultimately remanded to the district court with instructions to "redetermine the amount of actual loss to identified downstream-noteholder victims." *Id*. at 752 (emphasis added).

*Howard* is not applicable here, however, because there was no evidence presented to the district court that there were any downstream noteholders. Mr. Capra's claim is speculative and he does not identify any downstream lenders in his brief on appeal. Moreover, even if Mr. Capra did have information regarding downstream noteholders, he did not raise this argument below and "factual disputes regarding sentencing not brought to the attention of the district court do not rise to the level of plain error," *United States v. Lewis*, 594 F.3d 1270, 1288 (10th Cir. 2010) (brackets and internal quotation marks omitted).

21

3) <u>Organizer/leader enhancement</u>

Mr. Capra argues that the district court erred in enhancing his sentence for being an organizer or leader under U.S.S.G. § 3B1.1 because the court did not make sufficient factual findings and the trial record does not support the enhancement. The commentary to § 3B1.1 explains that:

> Factors the court should consider include the exercise of decision making authority, the nature of the participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others.

U.S.S.G. §3B1.1, note 4 (2014). But, "[t]he Guidelines do not require that each of these factors be satisfied for a section 3B.1.1 enhancement to apply." *United States v. Wacker*, 72 F.3d 1453, 1476 (10th Cir. 1995).

In rejecting defendant's argument that he was not an organizer or leader, the district court stated:

> He was the captain of the ship. He was the CEO of the company. There was testimony throughout the trial that the buck always stopped there. He's the one that had the girlfriend in that [sic] Nevada. He's the one that set up the phony companies so he could siphon off money to her.

R., Vol. 3 at 134. The court also found:

> The facts are that he was, Mr. Capra was the overall organizer and manager of a scheme to defraud mortgage lenders. As part of the fraud, they misrepresented the financial ability of buyers of homes in this neighborhood of nice homes that Mr. Capra's company built, making it appear at least on the application forms that the [buyers] were much more financially sound than they in fact were.

*Id*. at 202.

22

As noted above, "[w]e review the district court's factual finding that the defendant acted as a leader or organizer under § 3B1.1 for clear error." *Shengyang Zhou*, 717 F.3d at 1149. "Under this standard, we will not reverse the district court's finding unless, on the entire evidence, we are left with the definite and firm conviction that a mistake has been committed." *Id.* (internal quotation marks omitted).

Although it may have been preferable if the district court had been more thorough in articulating the reasons for the enhancement, the court's findings were specific enough to provide a clear picture of the reasoning the court employed. *Id.* at 1150. The trial testimony shows that Mr. Capra was extensively involved in devising and implementing the various aspects of the cash-back methods at the core of the scheme to defraud, he had significant decision-making authority on issues related to the cash-back methods, and he exercised control over others involved in the scheme. We see no clear error in the district court's finding that Mr. Capra was an organizer or leader.

III. Conclusion

For the foregoing reasons, we affirm the district court's judgment. We grant the motion to withdraw filed by Mr. Capra's court-appointed attorney, Robert Berger.

23

We also grant Mr. Capra's motion for leave to accept his pro se reply brief and permit him to proceed pro se.

Entered for the Court


Carolyn B. McHugh
Circuit Judge